Bosley, Appellant, *v.* Andrews.

Argued March 19, 1958. Before JONES, C. J. BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Walter A. Dart, Jr.,* with him *Guy Thorne,* and *Enoch C. Filer,* for appellants.

*William J. Joyce,* with him *Martin E. Cusick* and *Weisen, Cusick, Madden, and Joyce, Acker & McKay,* for appellee.

OPINION BY MR. JUSTICE BELL, June 4, 1958:

Defendant's cattle strayed on to plaintiffs' farm and injured their crops, for which the jury gave plaintiffs a verdict of $179.99. Mrs. Mary Louise Bosley, the wife-plaintiff, sought to recover damages for a heart disability which resulted from her fright and shock upon being chased by a Hereford bull owned by defendant. The bull did not strike or touch plaintiff, and plaintiff suffered no physical injury. The Superior Court sustained the entry of a nonsuit. Considering the record in the light most favorable to plaintiffs, the facts may be thus summarized.

On April 10, 1950, defendant's cattle got through the fence and went on to the plaintiffs' farm. Plaintiffs' daughter and grandson were driving the cattle off plaintiffs' property. Plaintiff, Mrs. Bosley came out to help them. Plaintiffs' daughter testified as follows: "As I was driving the cattle, . . . mother was started up towards where I was at to help me and I told her . . . That she didn't need to help me, that they were going all right, so she turned to go up to where my son was and when she turned a bull charged mother out of the herd as she turned and I hollered to her and I told mother then, I says, 'Mom, look out, there's a bull after you.' As she turned her head to look, the bull was charging her and *she started to run and as she started to run, she collapsed."*

Mrs. Bosley testified: "Q. What did you do when your daughter warned you about the bull? A. I turned around and looked, and he was coming at me with his head down, and I started to run, but I thought *I could not get my legs to go and I choked up and I collapsed,* and momentarily, I thought he was going to get me, I could just even feel that he was on top of me. Q. About

---

* Italics throughout, ours.

how far away from you was the bull when you first saw him? A. I would say around twenty-five feet. He looked awful close to me. I thought he was right on top of me."

Very fortunately, harassed by a dog, the bull either stopped or was diverted, and the evidence does not show that he got any nearer to Mrs. Bosley than approximately 25 feet. Plaintiff collapsed on the ground and had an attack of coronary insufficiency—shortness of breath, pain in her chest and an insufficiency of blood flowing into the artery into the heart. Her daughter called a doctor. Mrs. Bosley's two doctors, Dr. Gilbert A. Diehl and Dr. A. C. Ernstene, a heart specialist at the Cleveland Clinic, agreed that prior to this episode with the bull, Mrs. Bosley had had arteriosclerosis and cardiac insufficiency,* which resulted from arteriosclerosis; and that *"the episode with the bull did not cause the coronary arteriosclerosis* but it does constitute the trigger mechanism that brought the symptoms into clinical prominance."* Arteriosclerosis is a hardening of the arteries which comes with age and is usually a long gradual process.

Dr. Diehl said: "A. . . . . Coronary insufficiency gives you discomfort and pain. Cardiac insufficiency is when the heart fails and cannot do the job it should, and I feel that she had had both of these as a result of the arterio-sclerotic heart disease."

Dr. Diehl further testified that plaintiff's heart was of normal size every time he examined her, that he found no enlargement of her heart, no physical damage, no occlusion, thrombosis and no embolism. Mrs. Bosley did not know that she had arteriosclerosis or a cardiac insufficiency and had never previously suffered pain therefrom.

---

* Mrs. Bosley had also been suffering from bronchial asthma.

Plaintiff's doctors further testified that any violent exertion or shock, or sudden death in the family or a near accident while riding in an automobile could have produced the same result.

Plaintiff was a very nervous woman and had on a number of occasions after this episode fainted from coronary or cardiac insufficiency without any outside or known cause. She fainted when she was being examined in 1953 by defendant's doctor, and she also fainted in the courtroom. Dr. Diehl ascribed these fainting spells to a combination of nervousness and cardiac insufficiency.

The rule is long and well established in Pennsylvania that there can be no recovery of damages for injuries resulting from fright or nervous shock or mental or emotional disturbances or distress, unless they are accompanied by physical injury or physical impact:[*] *Koplin v. Louis K. Liggett Co.*, 322 Pa. 333, 185 A. 744; *Ewing v. Pittsburgh C. & St. L. Ry. Co.*, 147 Pa. 40, 23 A. 340; *Fox v. Borkey*, 126 Pa. 164; *Huston v. Freemansburg Borough*, 212 Pa. 548, 61 A. 1022; *Morris v. Lackawanna and Wyoming Valley Railroad Co.*, 228 Pa. 198, 77 A. 445; *Howarth v. Adams Express Company*, 269 Pa. 280, 112 A. 2d 536; *Hess v. Philadelphia Transportation Co.*, 358 Pa. 144, 56 A. 2d 89; *Potere v. Philadelphia*, 380 Pa. 581, 112 A. 2d 100; *Gefter v. Rosenthal*, 384 Pa. 123, 119 A. 2d 250.

In the leading case of *Koplin v. Liggett Co.*, 322 Pa., supra, plaintiff claimed damages because she became nauseated by the presence of a centipede in the spoon with which she was eating her soup, and was made sick for several weeks. This Court denied recovery and

---

[*] The additional words "a physical impact" appear only in *Potere v. Philadelphia*, 380 Pa., supra, and *Gefter v. Rosenthal*, 384 Pa., supra.

said (page 335) : " 'There can be no recovery for injuries resulting from fright, or a nervous shock, unaccompanied by physical injuries': Howarth v. Adams Express Co., 269 Pa. 280, 112 Atl. 536 . . ."

In *Morris v. Lackawanna and Wyoming Valley Railroad Co.*, 228 Pa., supra, plaintiff claimed damages for a miscarriage resulting from a nervous shock occasioned by the electric car in which she was riding *bumping* over the track at an open switch. This Court denied recovery and said (page 200) : ". . . The learned court below followed the rule of our Pennsylvania cases in holding that there can be no recovery of damages for bodily or mental suffering resulting from fright unconnected with physical injury. While, it is true, this rule has been relaxed more or less in some jurisdictions, it has been uniformly upheld and applied in our state: Fox v. Borkey, 126 Pa. 164; Ewing v. Railway Co., 147 Pa. 40; Linn v. Duquesne Boro., 204 Pa. 551; Huston v. Freemansburg Boro., 212 Pa. 548; Chittick v. Rapid Transit Co., 224 Pa. 13. In very recent cases the rule has been reiterated as being settled law here."

In *Ewing v. Pittsburgh C. & St. L. Ry. Co.*, 147 Pa., supra, plaintiff's statement of claim averred that by a collision on defendant's railroad which occurred through the negligence of defendant's employees, defendant's cars were derailed and thrown against plaintiff's dwelling and she was thereby subjected to great fright, fear and nervous distress, became sick and disabled and was unable to attend to her usual work and duties. A demurrer to the statement of claim was sustained because plaintiff's fright and nervous distress were unaccompanied by *bodily injury*.

In *Fox v. Borkey*, 126 Pa., supra, plaintiff was husking with her husband. An explosion occurred which was caused by defendant's blasting; the earth trembled

and dirt blew over them as if it were hail. Plaintiff fell to the ground, trembling all over with shock; she became very nervous and had heart trouble and "was reduced to a physical wreck by the grossly negligent, if not intentional, misconduct of the defendant." The Court denied recovery.

In *Potere v. Philadelphia*, 380 Pa., supra, a contractor and the city were held jointly liable for a cave-in of a city street as the result of which plaintiff suffered physical injuries and a severe shock to his nervous system which was diagnosed as an anxiety neurosis. The Court said (page 589): "It has been well established that in the absence of physical injury or physical impact, mental or emotional distress is not the subject of legal redress: Linn v. Duquesne Borough, 204 Pa. 551, 54 A. 341; Koplin v. Louis K. Liggett Company, 322 Pa. 333, 185 A. 744. However, where, as here, a plaintiff sustains *bodily injuries,* even though trivial or minor in character, *which are accompanied by fright or mental suffering directly traceable* to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages: Applebaum v. Philadelphia Rapid Transit Co., 244 Pa. 82, 90 A. 462; Hess v. Philadelphia Transportation Company, 358 Pa. 144, 56 A. 2d 69."

Similarly, in *Hess v. Philadelphia Transportation Co.,* 358 Pa., supra, a recovery was allowed plaintiff for his physical injuries and neuroses which developed from the terrible fright resulting from an electric shock which came from an over-head loose trolley wire which came in contact with plaintiff's car. The electric shock *lifted plaintiff up out of the seat of the car.* He hit the steering wheel. The Court allowed recovery for the physical injury and for the injury to plaintiff's nervous system resulting from the fright, and said (pages 147, 148): "That there can be no recovery for

injuries resulting from fright, or a nervous shock, unaccompanied by physical injuries is the established law in this state. See Koplin v. Louis K. Liggett Co., 322 Pa. 333, 185 A. 744; Howarth v. Adams Express Co., 269 Pa. 280, 112 A. 536; Ewing v. Pittsburgh, Cincinnati and St. Louis Ry. Co., 147 Pa. 40, 23 A. 340; Huston v. Freemansburg Boro, 212 Pa. 548, 61 A. 1022. In the latter case Chief Justice MITCHELL characterized 'mere mental disturbance' as being too 'intangible, so untrustworthy, so illusory and so speculative' to be a cause of action. However, in applying the above rule, a 'nervous shock' must be distinguished from an 'electric shock'. An electric shock is 'a direct physical and personal assault', and any fright or nervous disorder arising from such an 'assault' negligently caused is compensable in damages . . . 'Mental suffering, as distinct from bodily pain, can be considered in an action for damages for injury to the person, when such suffering is attendant upon and results from a physical injury: Wilcox v. Richmond & Danville Ry. Co., 52 Federal Reporter, 264.' "

Plaintiff cites a number of decisions of this Court to support her claim but fails to realize that in those cases where recovery was allowed for nervous shock, *the nervous shock was accompanied by physical injuries,* and that all of her cases recognize and reiterate the above mentioned well settled rule.* What plaintiff is really asking us to do is to review and change the rule which has been so long and clearly established by our cases, because the courts of many other States and the Restatement allow recovery for shock and emo-

---

* For example *Howarth v. Adams Express Co.*, 269 Pa. 280, 112 A. 536 (where there was an actual physical injury to her back) ; *Potere v. Philadelphia*, 380 Pa. 581, supra, (bodily injuries plus severe shock to the nervous system).

tional disturbances where there has been no physical injury or physical impact.

To allow recovery for fright, fear, nervous shock, humiliation, mental or emotional distress—with all the disturbances and illnesses which accompany or result therefrom—where there has been no physical injury or impact, would open a Pandora's box. A plaintiff might be driving her car alertly or with her mind preoccupied, when a sudden or unexpected or exceptionally loud noise of an automobile horn behind or parallel with her car, or a sudden loud and unexpected fire engine bell or siren, or a sudden unexpected frightening buzz-sawing noise, or an unexpected explosion from blasting or dynamiting, or an unexpected nerve-wracking noise produced by riveting on a street, or the shrill and unexpected blast of a train at a spot far from a crossing, or the witnessing of a horrifying accident,* or the approach of a car near or over the middle line, even though it is withdrawn to its own side in ample time to avoid an accident, or any one of a dozen other everyday events, can cause or aggravate fright or nervous shock or emotional distress or nervous tension or mental disturbance. Such an event, if compensable, may cause normal people, as well as nervous persons and persons who are mentally disturbed or mentally ill, to honestly believe that the sudden and unexpected event caused them fright or nervous shock or nervous tension with subsequent emotional distress or suffering or pain or miscarriage or heart attack, or some kind of disease. In most cases, it would be impossible for medical science to prove that these subjective symptoms could not possibly have resulted from or been aggravated or precipitated by fright or nervous shock or nervous tension or emotional disturbance or distress, each of which

---

* Which was caused by the negligence of the defendant.

can in turn produce an ulcer or headaches or fainting spells or, under some circumstances, a heart attack, or a serious disease. For every wholly genuine and deserving claim, there would likely be a tremendous number of illusory or imaginative or "faked" ones. Medical science, we repeat, could not prove that these could not have been caused or precipitated or aggravated by defendant's alleged negligent act.

We have considered all of the contentions of the plaintiffs but find no merit in them.

The judgment of the Superior Court is affirmed in each appeal.

Mr. Justice COHEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Like those human beings who believe that fame and fortune always lie in some land distant from their own, the cows of the Dale Andrews farm in West Salem, Mercer County, were not satisfied to browse and chew their cuds in their own pasture. They were certain that in the fields across the highway which bordered their owner's domain, the grass was greener, the earth fresher, the trees shadier, and the skies above bluer. Thus from time to time they would leave their own preserves and invade the Bosley farm on the other side of the road where, with the spirit of bovine buccaneers, they devoured their neighbor's corn and wheat, destroyed his vegetable gardens, knocked over young peach trees, damaged the apple orchard, mangled berry bushes, and eventually departed, leaving behind them a wide swath of ruin and destruction. They sometimes went away of their own accord, but frequently they had to be driven back to their home territory by the Bosleys.

On the morning of April 10, 1950, at about 9 o'clock they ambled over to the Bosley farm to breakfast in the fields which were the scene of former invasions but before they reached the regurgitation stage, Mrs. Evelyn Turner (married daughter of the Bosleys), assisted by a trained cattle dog, which was half collie and half of indeterminate breed, headed them off and sent them mooing back to their own pastures. By noon, however, they forgot their defeat of the morning and decided to visit the Bosleys for lunch. This time they came, eight of them, with reinforcements. They brought along their boy friend, a 1500-pound Hereford white-faced bull.

Inspirited and encouraged by their horned escort, the female bovines overran the peach trees and apple orchard when Mrs. Turner, who was in the field with her 6-year old son and the dog, sounded the alarm to her mother, Mrs. Bosley, then in the house. Mrs. Bosley at once rang up the Andrews on the telephone to tell them to call off their cloven-hoofed trespassers, and then hurried outside to assist her daughter, not knowing of the presence of Mr. Hereford. Mr. Hereford and Mrs. Bosley saw each other at the same time. Mrs. Bosley screamed, and the truculent Hereford lowered his head to charge. Terror-stricken, Mrs. Bosley tried to run, but, as in a bad dream one cannot flee although disaster is at one's heels, she froze to the spot. As she later described the agonizing moment: "I turned around and looked, and he was coming at me with his head down, and I started to run, but I thought I could not get my legs to go and I choked up and I collapsed, and momentarily, I thought he was going to get me, I could just even feel that he was on top of me."

In the meantime, the collie-mongrel dog, who was to become the unwreathed hero of the episode, bounded into the space between the bull and the terror-stricken woman. The bull then, as dull-witted as his brothers

in the shouting arenas of Spain who pursue an innocuous red rag, took after the dog, and Mrs. Bosley was saved from a leaden-footed toreador's end.

After managing some five stumbling steps, Mrs. Bosley fainted. Upon regaining consciousness, her daughter was rubbing her wrists and her grandson was crying: "Nan, Nan, are you breathing?" From this point she was helped to the barn some 150 feet away where she remained for half an hour. From here she was assisted to a milk house between the barn and the family dwelling. Finally she was taken home where she was at once put to bed. A doctor was summoned and he found her suffering from "an attack of coronary insufficiency and some heart failure."

Following ten days' confinement to bed she was taken to the Greenville Hospital where she remained 17 days. Since then her health has never been good. She suffers sinking spells and blackouts, she is weak and exhausted, she has become a periodical guest of clinics and hospitals. It is the medical opinion of Dr. G. H. Diehl, who treated her from the day of the bull episode, that the angina pectoris, with which she is at present afflicted, was precipitated by "the running, the chasing and the fear that was caused when the bull chased her." It is his opinion further that Mrs. Bosley "will probably always have angina pectoris and cardiac insufficiency in the future."

Oliver H. Bosley, husband to Mrs. Mary Bosley, and Mrs. Bosley in her own right, brought suit in trespass against Dale Andrews on three counts: (1) for damages done to Bosley's crops, (2) for injuries to Mrs. Bosley, and (3) for expenses incurred by Mr. Bosley on account of his wife's injuries. The plaintiffs recovered a verdict on the first count, but the Trial Judge directed a verdict for the defendant on the second and third counts. The plaintiffs appealed to the Superior

Court which affirmed the action of the lower court by a 4 to 3 vote; and the plaintiffs, by obtaining an allocatur, appealed to this Court which has affirmed the decision of the Superior Court.

The Majority Opinion of this Court states at the outset that Mrs. Bosley "sought to recover damages for a heart disability which resulted from her fright and shock upon being chased by a Hereford bull owned by defendant." The Majority thus admits that Mrs. Bosley's heart disability is a result of the fright and shock caused by the aggressiveness of the defendant's bull. Although the bull was about 25 feet away from Mrs. Bosley when she first beheld him charging toward her, she ran some "five steps" before she collapsed. Allowing for at least two feet for each step, it becomes evident that the bull was within 10 to 15 feet of Mrs. Bosley before his course was diverted. It is enough merely to visualize a snorting, charging bull with impaling horns only a dozen feet away, to grasp at once the magnitude of Mrs. Bosley's fright and the extent of the terror to which she was subjected.

Although there is evidence that Mrs. Bosley did suffer from arteriosclerosis prior to April 10, 1950, it was the charge by the bull which, as another doctor (Dr. Ernstene) testified, "constituted the trigger mechanism that brought the symptoms into clinical prominence." The defendant's attorney, in cross-examining Dr. Ernstene, asked if some other shock might not have brought on the heart attack. Specifically, he asked if an automobile accident, or sudden death in the family, might not have been capable of precipitating a heart attack such as Mrs. Bosley experienced. The doctor answered these questions in the affirmative, thus strengthening the plaintiff's case, instead of weakening it.

The answers demonstrated that it was the doctor's belief that it would take a severe shock of some kind to trigger the plaintiff's disability, a shock such as would have been caused by an automobile accident, the sudden death of a near relative, or the peril of being gored to death by a charging bull.

The defendant's attorney cross-examined Dr. Diehl to the same effect and got similar answers. Dr. Diehl testified further: "The episode with the bull precipitated the cardiac insufficiency or the heart insufficiency and coronary insufficiency."

He also explained that: "In this type of patient, Mrs. Bosley got along very well with her normal duties around the house, without any symptoms, without any heart failure, but *with the running, the chasing and the fear that was caused when the bull chased her, it precipitated her first attack of coronary insufficiency* which caused her severe pain and her coronary cardiac insufficiency which caused early heart failure and from then on, she had her subsequent attacks which were directly based on that."[1]

In view of the fact that the lower court gave binding instructions for the defendant we are required in this review to read the evidence in the light most advantageous to the plaintiff.[2] In doing so, this Court may not discredit the evidence of the plaintiff's physicians. And, once this Court accepts that vital evidence, it is bound to order a new trial, that is, insofar as the law of cause and effect is concerned. But this Court says that even if we conclude that Mrs. Bosley's present physical disablement is the result of the fright, shock, and strain she experienced when the defendant's bull chased her, she is not entitled to a verdict because

---

[1] Italics throughout, mine.

[2] *Virgilio v. Walker and Brehm*, 254 Pa. 244.

it would be bad policy to allow her to recover. The Majority says: "To allow recovery for fright, fear, nervous shock, humiliation, mental or emotional distress—with all the disturbances and illnesses which accompany or result therefrom—where there has been no physical injury or impact, would open a Pandora's box."

What is in Pandora's box which would apply to cases of this character? The Majority does not specify, but presumably it fears that from Pandora's box there would issue forth what it recounts in the immediately following sentence, namely: "A plaintiff might be driving her car alertly or with her mind preoccupied, when a sudden or unexpected or exceptionally loud noise of an automobile horn behind or parallel with her car, or a sudden loud and unexpected fire engine bell or siren, or a sudden unexpected frightening buzz-sawing noise, or an unexpected explosion from blasting or dynamiting, or an unexpected nerve-wracking noise produced by riveting on a street, or the shrill and unexpected blast of a train at a spot far from a crossing, or the witnessing of a horrifying accident, which was caused by the negligence of the defendant, or the approach of a car near or over the middle line, even though it is withdrawn to its own side in ample time to avoid an accident, or any one of a dozen other every-day events, can cause or aggravate fright or nervous shock or emotional distress or nervous tension or mental disturbance."

I would say that a woman who could run the gamut of such a potential succession of blasts, shrills, dynamitings, nerve-wracking rivetings, explosions, buzzings, horn blowings, siren wailings and bell tollings, and emerge alive at the end—a trip more fraught with wild excitement and adventure than Vice President Nixon's journey through South America—should be compen-

sated in some fashion, if not in a lawsuit, at least by public subscription.

The great fear of the Majority seems to be that if we should allow the plaintiff in this case to submit her case to a jury, and, incidentally, *that is all she is seeking,* the courts would be beseiged with "faked" cases. The Majority prophesies with alarm: "For every wholly genuine and deserving claim, there would likely be a tremendous number of illusory or imaginative or 'faked' ones."

But are our courts so naive, are they so gullible, are they so devoid of wordly knowledge, are they so childlike in their approach to realities that they can be deceived and hoodwinked by claims that have no factual, medical, or legalistic basis? If they are, then all our proud boasts of the worthiness of our judicial system are empty and vapid indeed.

The Majority's apprehension that if we should allow the instant case to go to a jury for factual determination, the courts would be engulfed in a tidal wave of lawsuits, is to look upon a raindrop and visualize an inundation. Many jurisdictions[3] now permit recovery where physical disablement tortiously caused is not made manifest through visible trauma, and I have seen no report that in those States the courts are awash in trumped-up cases. Many States at one time followed the non-liability doctrine but later abandoned it. In such a transitional case (*Orlo v. Connecticut Company,* 128 Conn. 231), Chief Justice MALTBIE of the Supreme Court of Connecticut announced that court's acceptance of the liability rule in the following language: "Our conclusion is that where it is proven that negli-

---

[3] In a well written article, appearing in the Temple Law Quarterly, Vol. 31, 1958, the author, Charles Potash, states that thirty-three jurisdictions in the United States allow recovery.

gence proximately caused fright or shock in one who is within the range of ordinary physical danger from that negligence, and this in turn produced injuries such as would be elements of damage had a bodily injury been suffered, the injured party is entitled to recover. This position is supported by the commentators to whose writings we have referred. It is that approved in the Restatement, although with the caveat previously referred to, 2 Torts §436. The English courts have finally come to it. Pollock, Torts (14th Ed.) 39. Among a considerable number of American cases supporting such a conclusion are the following: [enumerating here cases in New Hampshire, Rhode Island, Nebraska, Washington, South Carolina, Minnesota, Alabama]."

The Majority Opinion says that: "The rule is long and well established in Pennsylvania that there can be no recovery of damages for injuries resulting from fright or nervous shock or mental or emotional disturbances or distress, unless they are accompanied by physical injury or physical impact."

It is true that this Court has consistently denied recovery in the type of cases described in this quotation, but that does not mean that, consonant with law, reason, and justice, it should continue to do so. *Stare decisis* is the viaduct over which the law travels in transporting the precious cargo of justice. Prudence and a sense of safety dictate that the piers of that viaduct should be examined and tested from time to time to make certain that they are sound, strong and capable of supporting the weight above. One of the piers supposedly upholding the span of non-liability is the case of *Huston v. Freemansburg*, 212 Pa. 548, cited in the Majority Opinion. A review of that alleged authority will reveal it to be made up of something less than the durable masonry which should be the founda-

tion of any jurisprudential structure in America. Chief Justice MITCHELL, who wrote the opinion in that case, said: "In the last half century the ingenuity of counsel, stimulated by the cupidity of clients and encouraged by the prejudices of juries, has expanded the action for negligence until it overtops all others in frequency and importance, but it is only in the very end of that period that it has been stretched to the effort to cover so intangible, so untrustworthy, so illusory and so speculative a cause of action as mere mental disturbance. It requires but a brief judicial experience to be convinced of the large proportion of exaggeration and even of actual fraud in the ordinary action for physical injuries from negligence, and if we opened the door to this new invention the result would be great danger, if not disaster to the cause of practical justice."

With all the respect that one naturally holds for the jurists of the past, I cannot generate any veneration for this intemperate outburst. On the contrary, I believe that it should be repudiated and condemned. It amounts to an unjust attack on our whole judicial system. It lays under suspicion every attorney at the bar, casts a shadow on every plaintiff litigant, and shamelessly condemns juries as being motivated by unworthy intentions. Fifty-three years have passed since Mitchell's philippic, but, despite his dire prophecies, there is no report of disaster in those States which allow recovery for mental and nervous disorders caused by tort, even though unaccompanied by physical injury.

A brief recital of the facts in some of the cases decided by this Court on the subject under discussion will demonstrate that not all the decisions commend themselves to the goddess of Justice.

I quote verbatim the Majority's reference to one of the cases: "In Fox v. Borkey, 126 Pa., supra, plaintiff was husking with her husband. An explosion occurred which was caused by defendant's blasting; the earth trembled and dirt blew over them as if it were hail. Plaintiff fell to the ground, trembling all over with shock; she became very nervous and had heart trouble and 'was reduced to a physical wreck by the grossly negligent, if not intentional, misconduct of the defendant.'" In that case the jury returned a verdict for the plaintiff but this Court reversed. Under the Majority's own summation it can scarcely be said that the reversal was just.

In *Morris v. L. & Wyo. Val. R. R. Co.*, 228 Pa. 198, the plaintiff suffered a miscarriage as the result of the derailment of the railway car in which she was riding, the derailment being caused by defendant's negligence. It was admitted that the miscarriage resulted from the nervous shock occasioned by the car bumping over the track at an open switch. Nevertheless this Court affirmed a judgment of nonsuit.

Another case cited by the Majority Opinion is equally insupportable in justice. In *Ewing v. P. C. & St. L. Ry. Co.*, 147 Pa. 40, the plaintiff averred in her statement of claim that the defendant railroad company, through negligence, ran a train of cars into another car and, in the resulting collision, one of the cars was catapulted to and on her house. Although she sustained no bone fractures or bleeding wounds, the plaintiff, because of the fear of imminent death, suffered nervous shock, she "became sick and disabled," and "continues to suffer great mental and physical pain." The lower court sustained a demurrer, and this Court upheld the demurrer. In its per curiam opinion this Court asked the rhetorical question: "What duty did the company owe this plaintiff?" The answer is a

simple one. It owed the plaintiff the duty of keeping its cars on the railroad track and not hurling them on to her house.

Raising the same irrelevant and exaggerated alarm in the *Ewing* case which the Majority is raising here, the Court said there: "If mere fright, unaccompanied with bodily injury, is a cause of action, the scope of what are known as accident cases will be very greatly enlarged; for, in every case of a collision on a railroad, the passengers, although they may have sustained no bodily harm, will have a cause of action against the company for the 'fright' to which they have been subjected." But Mrs. Ewing was not a passenger. She was in her own house when the sky began to rain railroad cars.

I have said that this Court has been consistent in refusing recovery in this type of case. I must modify that statement somewhat. There has been an occasion or two when a ray of wholesome and humane inconsistency broke through the dark clouds of illogical consistency. Thus, in the case of *Howarth v. Adams Express Co.,* 269 Pa. 280, there was the situation of a woman who was ascending the stairs in her home when a truck collided with the outside of the dwelling, causing her to fall and sustain an injury to her back. The truck in no way touched her. The defendant in that case argued the usual Pennsylvania rule that there could be no recovery because there was no physical impact between the tortfeasor's instrumentality and the victim of the tort. Justice WALLING, however, speaking for a unanimous Court, said: "Here there were no visible external marks upon the person of Mrs. Howarth, but her own testimony, and that of her physicians, indicate an actual physical injury to her back, sufficient to take the case to the jury . . . While a recovery should not be sustained in such case upon dubi-

ous evidence, *it cannot be affirmed as matter of law that the physical injury must be externally visible.*"

Another ray of sunshine broke through the gloomy firmament of illogical consistency in the case of *Samarra v. Allegheny Valley Street Railway Co.*, 238 Pa. 469. There, the plaintiff was thrown to the floor of a street car which had left the tracks. She sought damages for a succeeding neuritis. The railway company argued that she had sustained "no physical injury whatever," and that "at most the evidence discloses nothing more than a case of nervous shock or fright from the unusual occurrence unaccompanied with physical injury." Therefore, the case should not have been submitted to the jury. This Court held to the contrary. Justice STEWART, speaking again for a unanimous Court, said: "The testimony of the plaintiff herself as to the immediate occurrence and conditions which immediately followed with respect to her sufferings, which have continued remediless to this time, supported as it was by the testimony of her attending physician, who gave it as his judgment that her disability resulted from the injuries she received in the accident, established a prima facie case. On this state of the evidence it would have been clear error to have withheld the case from the jury." In logic and sheer rationalization, what is the difference between being thrown to the floor because of a rampaging street car and being thrown to the ground because of a rampaging bull when, in neither case was there any contact between the tortfeasor's instrumentality and the victim?

Then there is the case of *Hess v. P. T. C.*, 358 Pa. 144, 146, where the plaintiff claimed damages for a psychoneurosis which followed an alleged electric shock resulting from an electric wire falling on his automobile. This Court, in reviewing the case, said: "Dr. Bern-

stein, plaintiff's family physician, testified that he found *no physical evidence of injury;* that plaintiff *had no organic injuries* but *apparently was suffering from a mental neurosis* which made him believe many things were wrong with him . . . Dr. Drayton, a neuropsychiatrist, examined plaintiff on December 10, 1945 and likewise discovered *no signs of physical injury.* He diagnosed plaintiff's condition as 'intense psychoneurosis.' Dr. Drayton conceded the genuineness of Hess' mental state and attributed it to a 'terrible fright' emerging probably from the realization that 'he was lucky to be alive.' "

This Court approved the verdict rendered in favor of the plaintiff. It is, of course, proper to say, as this Court said, that there is a difference between an electric shock and a mental shock, but there is a slight inconsistency (which, under the circumstances involved, is welcomed) in this Court's saying that there can be no recovery without physical injury and then affirming a verdict where the evidence indicates that the plaintiff's psychoneurosis was occasioned as the result of a severe fright, without physical injury.

But even if we were to assume the absolute correctness in law and justice of this Court's decisions which in the past have denied liability for mental and nervous conditions not connected with physical fracture and laceration, this would not be to say that such liability cannot be proclaimed today. It could well be that conditions have changed and, therefore, the whole problem should be re-evaluated, especially in view of the tremendous progress which has been made in the fields of mental, cardiac, and neurological research. With highly sensitive equipment and with accurately developed laboratory formulae, plus a profounder knowledge in the whole cyclopedia of health versus disease, doctors and scientists no longer stand helpless before

the problem of determining the causation of abnormal behavior in man. And if that increased knowledge decreases the possibility of fraudulent claims evading the argus-eyed vigilance of court and jury, there should be a change in the judicial attitude toward the type of claim under consideration.

The Supreme Court of Maryland, addressing itself to this very subject, well said: ". . . It is objected that the effect of fright is subjective, imaginative, conjectural, and speculative, and therefore easily simulated and feigned, so that its actual existence is difficult to ascertain, and, if found to exist, is inherently insusceptible of compensation by any precise pecuniary standard. These considerations undeniably tend to multiply fictitious or speculative claims, and to open to unscrupulous litigants a wide field for exploitation, but these difficulties are common, are surmountable, and *so should not prevent the operation of the general and fundamental theory of the common law that there is a remedy for every substantial wrong . . .*" (*Bowman v. Williams*, 164 Md. 397, 403)

In the case of *Collins v. Chartiers V. Gas Co.*, 131 Pa. 143, 159, this Court, considering a controversy which involved augmented information and scientific data on the subject of spring water contamination, made a pregnant, wholesome, and forward-looking pronouncement: "If this is the state of knowledge at the present day; if the existence of a stratum of clear water, and its flow into wells and springs of the vicinity, and the existence of a separate and deeper stratum of salt water, which is likely to rise and mingle with the fresh, when penetrated in boring for oil or gas, are known, and the means of preventing the mixing are available at reasonable expense, then clearly, *it would be a violation of the living spirit of the law not to recognize the*

*change, and apply the settled and immutable principles of right to the altered conditions of fact."*

It seems to me that it is a violation of the living spirit of the law to adhere to an ancient rule which has no pragmatic application to realities of today. A precedent, in law, in order to be binding, should appeal to logic and a genuine sense of justice. What lends dignity to the law founded on precedent is that, if analyzed, the particularly cited case wields authority by the sheer force of its self-integrated honesty, integrity, and rationale. A precedent can not, and should not, control, if its strength depends alone on the fact that it is old, but may crumble at the slightest probing touch of instinctive reason and natural justice. With such criteria in mind, it is difficult to understand how this Court can allow damages for mental and nervous disability if incurred at the same time that a finger is bruised, but will deny compensation of any kind to the victim who sustains no outer mutilation but will be invalided for life because his inner mechanism has been shattered beyond repair.

In the case of *Potere v. Philadelphia,* 380 Pa. 581, 589, the plaintiff was driving a truck in Philadelphia when the street caved in beneath him, over an open tunnel. The cab of his truck suspended momentarily at the edge of the abyss, allowing him to escape to safety before the truck fell. His physical injuries were slight but the terror he experienced as he teetered between escape and a possible fatal drop into the tunnel brought on an anxiety neurosis, for which he claimed and received damages at the hands of the jury. The defendant City of Philadelphia complained that the plaintiff was not entitled to recovery for the anxiety neurosis. This Court affirmed the verdict and, speaking through Justice CHIDSEY, said: "It has been well established that in the absence of physical injury or

physical impact, mental or emotional distress is not the subject of legal redress . . . However, where, as here, a plaintiff sustains bodily injuries, *even though trivial or minor in character,* which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages."[4]

If, in the *Potere* case, the jury could trace the connection between the plaintiff's neurosis and his fear of falling in the tunnel, why may it not trace the connection between Mrs. Bosley's heart disablement and the fear which overwhelmed her when she expected that any moment she might be gored by the defendant's bull?

What is the difference, in point of liability, on the part of a railroad company, between a case where a passenger's arm is cut in a train wreck, and a case where a passenger suffers a broken heart valve as a result of the fear he experienced in expecting death as a car passed over him? Is the negligence and responsibility of the tortfeasor any less marked toward the living man than to the dead man's family when, after the throb of the overturned locomotive has ceased and the hissing of the punctured air brakes has faded away, there lie on the ground, next to one another, the body of

---

[4] I would think that the *Potere* case overruled *Chittick v. Phila. Rapid Trans. Co.*, 224 Pa. 13, but I note that the Majority still cites it as authority. In the *Chittick* case the plaintiff, who was sitting at a window 200 to 300 feet away from an electric explosion, was thrown to the floor, sustaining bruises to her person. She also was blinded temporarily, suffered pain in her eyes, followed by some impairment of vision and nervous weakness. The jury returned a verdict in her favor but this Court overruled, ignoring the fact that the plaintiff had actually received physical injuries apart from nervous shock and weakness.

a stark dead passenger and the body of a living passenger, unconscious, but unblemished by a single scratch? To determine liability by what follows rather than by what precedes and accompanies a catastrophe is like concluding that no earthquake has occurred because no one was killed even though the earth gaped and the houses danced as if doing a grisly quadrille.

The crux of this Court's position is that in cases where the plaintiff suffered no physical laceration, bruise, or abrasion, it is difficult to discover false claims. But is it not equally as difficult to uncover false claims where the mental or nervous disturbance is not physiologically connected with the bruise or laceration? In the *Potere* case, the plaintiff's sprained ankle and bruised elbow had nothing to do with his anxiety neurosis. As the jury had to determine whether the disablement in Potere's nervous system was caused by his fear of falling, could it not in this case have decided whether Mrs. Bosley's heart disablement was precipitated by her fear of being gored to death? Injury to the heart is a physical injury and not merely a mental or emotional vagary.

The heart has been so excessively the subject of poetic rhapsodizing that it would seem we may have lost sight of the fact that it is objectively a physical organ with mechanical functions as rigidly followed as the metallic movements of the village pump. Mrs. Bosley's ailment is not to be equated with intangible grieving or sentimental lamenting. Her heart condition is as much a matter of muscle and tissue as traumatic neuritis. However, while Mrs. Bosley's condition is tangible and palpable, it was caused by a force which did not touch her except through operation of the mind. But that does not mean that the application of the distant force was any less realistic. When a person whitens with fear, blushes with shame, shivers from appre-

hension, or petrifies with horror, there is no immediate bodily contact with the force which produces those definite physical reactions. But can we say that there is no actual bond between the emotion-creating phenomenon and the organism of the person who responds to the phenomenon? To answer that question in the negative would be to deny the most elementary certainties of human experience.

What provokes laughter? Is laughing not the result of a mental appraisement? But laughter itself is not mental. Abdominal, facial, and labial muscles, vocal cords, larynx and pharynx must all operate and coordinate in order to produce a hearty guffaw. What are tears? Except when they are concomitant with torture or whipping, they are the result purely of intangible thought. One thinks of a lost relative, a departed friend, a tragic event, and a saline solution forms in the eyes. A great deal of physical machinery goes into action to manufacture those drops of water, and it would be sheer perversity to say that there is no connection between the item of grief and the distillation of the resulting tears.

Can laughter and weeping ever be physically injurious? It is no figure of speech that people have actually laughed themselves to death. It is no rhetorical exaggeration to say that people have died of weeping and grief.[5] There is, therefore, an objective linking—

[5] King Richard II, Act. III, Scene iii:
"Aumerle, thou weep'st, my tender-hearted cousin!
We'll make foul weather with despised tears;
Our sighs and they shall lodge the summer corn,
And make a dearth in this revolting land.
Or shall we play the wanton with our woes,
And make some pretty match with shedding tears?
As thus, to drop them still upon one place,
Till they have fretted us a pair of graves
Within the earth; and, therein laid—these lies
Two kinsmen digg'd their graves with weeping eyes."

of cause and effect—between outer phenomenon and physical reaction. Thus, if one can die with laughing, perish with weeping and freeze from fear, how can it be said that there is no tie of contact between the terror of immediate death caused by the charging of a ferocious beast and a heart ailment which contemporaneously occurs and thereafter unceasingly continues?

One can think of many situations where a person could be gravely injured by a trespassing force which in no way physically touched him. For instance, the violent displacement of air caused by an explosion negligently performed could deafen a passerby who would most assuredly be entitled to recover from the trespasser even though he could show no outer lesion on his person. Instruments and expert examination would attest to ruptured eardrums. How would such evidence differ from the evidence presented by the doctors in this case, which was medical proof that the plaintiff had suffered organic damage to the heart?

The blinding light of an explosion improperly managed could ruin the eyesight of one fortuitously in the area. Certainly there would be no merit to a defense in such a case which argued that there was no actual impact between the blasted materials and the eyes of the blinded person.

The nervous system is peculiarly susceptible to nontangible excitation, and it is not to be denied that the wrecking of nerve ganglia can often be more disabling than the breaking of bones or the tearing of flesh. And where it is definitively established that such injury and suffering were proximately caused by an act of negligence, why should the tortfeasor not be liable in damages? Is law so lacking in the cognizance of natural science that it is incapable of following the fiery trajectory of the intangible bolt of lightning which blasts the towering tree?

This Court finds difficulty in attaching liability to the defendant in this case because of the gap between the bull's nose and Mrs. Bosley's prostrate body, which measured no more than 10 to 15 feet. If the animal's charging horns had advanced closer and had just grazed, without seriously harming Mrs. Bosley, then, according to the *Potere* case, she would be entitled to recover. This all produces in the law a heterogeneous pattern which did not escape Judge ERVIN of the Superior Court, who, in his powerful dissenting opinion when that tribunal passed on this controversy, said: "There can be no doubt that the plaintiff could have recovered if the bull had caught up with her and had butted her, even gently, and there can be no doubt that she would have recovered, not merely for the bruises resulting from being gently butted, but also for any heart condition which resulted from her emotional excitement. Likewise, there can be no doubt that if, in running away from the bull, she had fallen and had damaged her eye by running a weed into it, she could have recovered for that damage. To say that when she runs from the same trespassing bull and falls and suffers a heart attack, she cannot recover for the heart injury is making a distinction which cannot be justified." To carry Judge ERVIN's splendid argument a little further, suppose that Mrs. Bosley had already had an injured foot or even a rheumatic leg prior to April 10, 1950, but the strain of running away from the bull aggravated that condition. Would this Court, under its previous rulings, not have to hold, in such a situation, that she would be entitled to recover for what she suffered because of the aggravation of a previous condition? And, in that event, what would be the difference between a previously existing arteriosclerosis and a previously existing rheumatic leg?

The paradoxical law which the appellate Courts of Pennsylvania are now laying down, for lower courts to follow, goes even further than either Judge ERVIN or I have indicated. The Majority holds here that Mr. Bosley may not recover for the damages he sustained as the result of the fright and resulting heart disability suffered by his wife. However, under present law, if Mr. Bosley owned a horse which had been frightened, but not physically injured by the defendant's bull, he could recover for any loss in value of his horse occasioned by the fright. In the case of *Gillam v. Hogue,* 39 Pa. Superior Ct. 547, the plaintiff's horse was frightened by an automobile on the highway. As a result of the fright it could no longer be safely driven upon public roads and as a consequence its market value depreciated. Gillam sued the automobile owner and obtained a verdict. The defendant appealed and the verdict was affirmed. The Superior Court declared that although there could be no liability where alleged tortfeasors injured human beings, it was quite a different thing where animals were concerned.

Said the Superior Court: "The soundness as well as the necessity of the rule, in the case of human beings, is thus made apparent because the law makes no futile efforts to deal with things which, by their nature, are beyond the grasp of the instrumentalities through which it operates."

However, the Superior Court went on to say: "If it be a fact, born of the common observation of men in their everyday use of horses, that such an animal, when once subjected to a fright so severe as to cause it to run away, loses a portion of the commercial value it previously possessed, such fact may be proven by evidence just as convincing and satisfactory, as that which establishes any other fact, the existence of which becomes the object of judicial investigation."

But if evidence may be submitted to prove the deterioration of a horse caused by a fright, why may not evidence be accepted with regard to disability sustained by a human being who has suffered extraordinary terror due to the fault of another? And if it be said that a horse dismayed by an automobile will from then on be afraid of automobiles, can it not also be said that, very likely, Mrs. Bosley will from now on be afraid of bulls?

The Majority is loath to reverse in this case because, it says, "The rule is long and well established in Pennsylvania that there can be no recovery of damages for injuries resulting from fright or nervous shock or mental or emotional disturbances or distress, unless they are accompanied by physical injury or physical impact."

Let us suppose the following situation: Mr. A maliciously designs to visit serious harm upon Mrs. B who is frail, of a highly nervous disposition, and has a weak heart. As Mrs. B is walking along a dark lane at night, Mr. A steps out before her, wearing a lighted hideous mask and makes blood-curdling noises. Mrs. B collapses from fright but sustains no physical injury, nor is there any impact between her and Mr. A. However, she never gets over the shock and is invalided for life. To deny Mrs. B the right to recovery for the harm inflicted upon her in such a case would not only be an injustice but a monstrous wrong.

Let us take another case. Mr. A is a country physician who on an extremely cold night is summoned to attend a patient who lives 12 miles away. He travels in a top buggy drawn by a pair of horses. After treating the sick man he starts back home. Arriving at a railroad crossing he is held up for a period of from 45 to 50 minutes by a freight train. (It is admitted that there was negligence here on the part of the railroad

company.) The cold freezes his hands and penetrates his body. When he finally reaches home he is so numb and chilled that he has difficulty in removing his clothing. Articulate rheumatism sets in and he is invalided thereby for a long time. It is quite evident that his illness is the result of the exposure caused by the long wait at the railroad crossing. Does he have a good cause of action against the railroad company? This Court indubitably would say No, but our sister appellate Court has already answered that very question in the affirmative because this case is not, like the previous illustration, a hypothetical one. This is the actual case of *Cowdrick v. N. Y. Central R. R. Co.*, 65 Pa. Superior Ct. 416, where a verdict won against the railroad company was affirmed by the Superior Court.

Where was the impact between the railroad company and the physician? Did Boreas reach out with his icy fingers to seize the doctor and dislocate his bones? Did Boreas grasp the doctor's limbs and work them into articulate rheumatism? And if so, would this Court require the plaintiff to show that Boreas was an agent of the railroad company?

Is not this entire problem simply one of ascertaining effect from cause? Dr. Cowdrick was not struck by a railroad train, he was not bowled over by a piece of metal flung off from a passing locomotive. He was hurt by the artic weather from which he would have been insulated, had it not been for the negligence of the railroad company which exposed him to its frigid temperature for almost an hour. In the case at bar, Mrs. Bosley would not have been hurt had it not been for the negligence of Dale Andrews in exposing her to the bellicosity of his bull, which can be even more damaging than the blast of a winter's wind.

I would not recommend that the Supreme Court of Pennsylvania change one of its rules which is venerable with age, if it were one which appeals to reason, fairness, and justice. But when the rule defended by the Majority stands on such slippery ground as has been indicated in this case, should we not look to other jurisdictions to see how they are treating the same problem? The Majority Opinion does not lift binoculars to look across our borders into other States. It does not even apply spectacles to the Restatement, Torts. §436(2) of that magnificent compendium of legal principles states: "If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability."

Judge ERVIN states in his dissenting opinion in the Superior Court, and I agree with him, that this section is peculiarly applicable to the facts in the case at bar, and that the reasoning in Section 436(2) is sound: "The reasoning is supported by nearly all of the textbook authorities in the country and certainly by a great majority of the state courts. In view of this modern trend it seems entirely fitting that Pennsylvania should reconsider its position."

It is interesting to note also, as Judge ERVIN says, that the New York case which was relied upon by this Court in *Huston v. Freemansburg, supra,* was overruled in the case of *Comstock v. Wilson,* 257 N. Y. 231, by a Court composed of such brilliant juriats as CARDOZO, POUND, CRANE, KELLOG, O'BRIEN, HUBBS and LEHMAN.

In conclusion I would say that the Majority Opinion has concentrated its argument principally on the prop-

osition that it would be unwise to allow recoveries for mental and nervous disorders following fear, fright, and shock. However, the plaintiff is not claiming damages because of any mental or nervous ailment. At the risk of tiresome repetition I must repeat that she is asking for a verdict as the result of *physical damage* done to her heart. The fact that the heart is locked in one's breast does not make it inaccessible to doctors nor unfelt by its owner. Thus, in considering the nature and the extent of the plaintiff's disability we are dealing with something very tangible and very concrete.

The heart may be injured by a blow as easily as the lungs, liver, or any other internal organ. And that blow may be administered through the application of force against the outer walls or through the channels of the senses. It is a matter of common knowledge that persons afflicted with certain ailments must avoid excitement, not only the excitement of physical movement but that which is felt through the senses of sight, hearing, and possibly smell. The interlinking between sensory excitation and physiological reaction is such a historical, demonstrable, and everyday reality that to dwell on it at length would be like carrying the proverbial coals to Newcastle or crocodiles to the Nile.

Although afflicted with arteriosclerosis, Mrs. Bosley could have relished life in all its beneficial fullness. By observing whatever limitations doctors might have placed on her activities, there is no reason why she could not have looked forward to a reasonably long existence, enjoying with full flavor the many sweetnesses that normal living affords. The books are filled with cases of people who, because of an arterial burden, may not run as fast as athletes run for a train, bus, or street car, but who adjust themselves admirably to a less rapid pace and find more time to breathe in the fragrance of the garden of good, wholesome living. Mrs.

Bosley had every reason to look forward to that prospect.

A trespasser came to her home and struck her down. The bull belonging to the defendant was as much a trespasser and invader as a robber breaking through a window at night. As soon as the bull crossed the frontiers of the Bosley farm, its owner, Dale Andrews, was guilty of a trespass. Whatever damage succeeded that invasion, and because of that invasion, was Dale Andrews' responsibility. Under the law of *quare clausum fregit*, Andrew's liability was almost automatic.

Since the doctors have stated categorically that Mrs. Bosley's heart disability is the direct result of the bull's aggression, and since it is conceded that the bull's presence on the Bosley property constitutes an almost wanton trespass, it is inexplicable how this Court can legally dispose of a controversy which is peculiarly one for a jury's determination. The explanation offered in the Majority Opinion does not explain. To say that to grant what the law allows in this case might create an untoward situation in other cases is like saying that the fountain of justice should be boarded up because of the possibility that someone might drown in its salutary waters.

I would have the fountain flowing at all times, assured that the established safeguards of the law will keep away those who would defile its pure and refreshing essence just as those same safeguards are prepared, if not shackled, to hold responsible those who allow ferocious animals to roam at large to the hurt and grievous loss of the innocent and the unsuspecting, in the tranquil enjoyment of their homes, their gardens, and the prospect of a safe and cloudless future.

In recapitulation I wish to go on record that the policy of non-liability announced by the Majority in this type of case is insupportable in law, logic, and

elementary justice—and I shall continue to dissent from it until the cows come home.