## Imblum v. Banzhoff

*Jack E. Feinberg,* for plaintiffs.
*Katherine B. Kravitz,* for defendant Gordon K. Banzhoff, M.D., William Carr, M.D., Sambha Kundu, M.D., Mary L. Todd, M.D., and Banzhoff, Carr, Kunda & Todd.
*Craig Stone,* for defendant Holy Spirit Hospital.

DOWLING, J., April 23, 1992—With echoes of the great abortion/life debate, we have before us a case involving one of its concerns—the inquiry as to when a fetus is alive.

Shirley Jovanelly Totten received obstetrical care from the medical partnership of Banzhoff, Carr, Kunda & Todd. She phoned the doctors' office numerous times over the weekend of her due date concerning her condition, described symptoms which included a brown watery discharge and abdominal pressure, but was advised to wait at home for the onset of labor. By Sunday afternoon she insisted on meeting the doctors at Holy Spirit Hospital. There they had an ultrasound test performed and, based on its results, advised her that the fetus was no longer alive. The baby, named

Ashley Pauline Jovanelly, was buried; and Gary Imblum, Esquire, was issued letters of administration.

It is not clear whether baby Jovanelly was born alive, only that Ms. Jovanelly Totten was told that the fetus was dead while in utero. The complaint does allege that the fetus was alive at the hospital, but does not aver delivery of the baby. The hospital issued a record of birth for Ashley Pauline Jovanelly.

This medical malpractice suit includes a wrongful death action and a survival action. The preliminary objections filed by all defendants focus on the allegations of loss of filial consortium, pain and suffering, corporate liability, res ipsa loquitur and lack of specificity.

## PRELIMINARY OBJECTIONS OF DEFENDANTS BANZHOFF, CARR, KUNDU AND TODD

The defendant doctors first seek to have paragraph 28 stricken, as it presents a claim for filial consortium which, they aver, is prohibited by Pennsylvania law.

Paragraph 28 reads:

"As a result of the death of plaintiff's decedent, the survivors have been deprived of the comfort, aid, assistance, tutelage and maintenance that they would have received from decedent for the remainder of her natural life."

We wrote on this very issue in *Hollar v. Milton Hershey Medical Center,* 106 Dauph. L.J. 350 (1985), in what we consider to be one of our prime and more persuasive exhortations to unite the law with justice. It was to no avail, as appellate decisions continue to

cling to the hoary common law principles as set forth in decisions beginning before the War Between the States.

If we may quote from *Hollar:*

"Many, many years ago when Mr. Buchanan was in the White House, Fort Sumter intact and the railroads could do no wrong, it was decided in a case involving a *9-year-old boy who was run over by a train, had his foot amputated and received a verdict of $3,000 (which the court found so large as to be 'a violation of the Rules of Compensation')* that the jury had not been instructed to consider only pecuniary loss, and not to consider the father's 'lacerated feelings or his disappointed hopes.' *Pennsylvania Railroad Company v. Kelly,* 31 Pa. 372 (1858).

"Shortly thereafter and again involving the Pennsylvania Railroad, Peter Zebe, *'a lad about 12 or 13 years of age' was killed* when on leaving a train he was struck by a freight locomotive. *A $1,500 verdict was set aside* because the issue of damage was not sufficiently delineated in that the jury was not instructed that nothing may be allowed for 'solatium.' Justice Thompson, speaking for our Supreme Court, felt the jury had been given 'unrestrained license' ($1,500 was, of course, a great deal of money). He did, however, display some unusual candor in his opinion, 'No road, great or small, but would fall beneath the weight of such a rule applied; for an injury happening by a mere oversight amounting, of course, to negligence by some agent on the transit of the cars, it would be a severe penalty to visit the company with extravagant and ex-

terminating damages,' *Pennsylvania Railroad Company v. Zebe,* 33 Pa. 318 (1850).

"The Civil War may have abolished slavery and affected the rights of the states, but like Pickett's charge, it gained no ground on the above principles. In *Caldwell v. Brown,* 53 Pa. 453 (1866), Daniel, plaintiff's minor son, was working in defendant's rolling mill when the boiler exploded and he was killed. It was held that the employer was not bound to indemnify the employee for losses in consequence of the ordinary risks of the business nor for the negligence of a fellow servant unless there was some lack of care in the selection of the capable employee. It was further held that it was not error to charge, 'We cannot say that the negligence of the engineer would entitle the plaintiff to recover, provided he was a skilled engineer and a man of good character as such,' nor 'if the water was too low and the boiler ... it was not the fault of the defendants but of the fireman or the engineer, and if so, for the death of the boy, being a colaborer, plaintiffs cannot recover.' While these principles of justice have long since been discarded, the issue that the measure of damages was simply the money value of the boy's services remains. The court concluded, 'The jury gave $200 damages and we see no error of which the plaintiff can complain....' Plaintiffs are not to be allowed for the agonized feeling of parents, nor loss of his society. *Id.* at 459.

"In *Quinn v. Pittsburgh,* 243 Pa. 521, 90 A. 353 (1914), *a 10-year-old girl was seriously injured* when crossing a foot bridge in the city of Pittsburgh when she leaned against a railing which gave way. In instructing the jury on damages, the trial court said that

they could consider the companionship she could give her mother. Mr. Justice Stewart pounced on this declaring that the law does not recognize loss of companionship in any relation other than when a husband sues for injury to his wife. *He set aside a verdict* in favor of the mother *for $887.55* saying, 'It is impossible to know how much, if any, of this sum, was allowed for loss of companionship. It is enough to know that the jury was instructed to consider it as an element in determining what compensation to give....' *Id.* at 525, 90 A. at 354.

"Now it is 1930 and in the intervening years our industrial development has stabilized so that it can more or less stand on its own feet. We have even reached the point where labor unions have gained some recognition, though hardly acceptance by the courts. We have a workmen's compensation system to take care of injured employees, but *Kelly, Zebe* and *Brown* are still on the books and still reverently relied upon. In *Gaydos v. Domabyl,* 2301 Pa. 523, 152 A. 549 (1930), a widow was negligently killed by the defendant and survived by seven children. While the question of loss of consortium for a child was not at issue, the court, painting with a broad brush, reiterated that before there can be recovery for damages there must be a pecuniary loss citing *Caldwell v. Brown, supra*; and again, reiterating that there can be no damages for the loss of society or companionship as such of children." (emphasis supplied)

The only mention of this case we have located is in another lower court opinion, *Kingslinger v. Corsuch,* 48 D.&C.3d 160 (1988), where, as we were forced to, the lower court could not disregard the appellate

rulings and denied the claim. Since *Hollar*, there have been several Superior Court opinions, in one of which, *Steiner v. Bell Telephone Co.*, 358 Pa. Super. 505, 517 A.2d 1348 (1986), the court discussed at considerable length the pros and cons of allowing recovery for consortium by parents. All of the arguments were reviewed, and no point would be served by listing them here, since the sad result was that the law continued as before. (It should be noted that Judge Broadsky filed a vigorous dissent.) This ruling was then followed in *Schroeder v. Ear, Eyes and Throat Assoc.*, 383 Pa. Super. 440, 557 A.2d 21 (1989). It might be added that it would not appear that our Supreme Court has directly spoken on this issue. We can therefore only say, as did the unparalleled jurist, Michael A. Musmanno:

"In recapitulation I wish to go on record that the policy of non-liability announced by the majority in this type of case is insupportable in law, logic and elementary justice—and I shall continue to dissent from it until the cows come home." *Bosley v. Andrews*, 393 Pa. 161, 142 A.2d 263 (1958).

The doctors next seek to have paragraph 30 of the complaint stricken which makes claim "for the conscious pain and suffering undergone by plaintiff's decedent, up to and including the time of her death." They also take umbrage at use of the word "painful" in describing the baby's injuries in paragraph 20.

Defendants maintain plaintiff is not entitled to these damages, since the baby was stillborn and that one must be alive in order to recover for "conscious pain and suffering." They cite *Nye v. PennDOT*, 331 Pa. Super. 209, 480 A.2d 318 (1984). This case concerned

a situation where the decedent was killed instantly in an automobile accident, and held that where death is instantaneous, the decedent experiences neither pain nor suffering, and therefore an award for such damages would be unwarranted, adding that the same rule applies where the decedent is not conscious between the time of injury and the time of death.

There are several problems with this argument at this particular stage of the proceedings, i.e., preliminary objections in the nature of a motion to strike. Actually, the complaint contains no allegation to the effect that baby Jovanelly was stillborn at the time of birth. Allegation 19 of the complaint merely states that upon meeting the defendant doctors at the hospital, the "mother was advised that the fetus was no longer alive. There had been movement and life prior to that time." It would seem that further testimony would be needed as to the condition of the baby after delivery, particularly in view of the fact that the hospital issued a birth certificate. We feel that the plaintiff deserves the opportunity to develop further this phase of the case via depositions, medical records, autopsy reports, etc. Furthermore, the assumption that the fetus in utero does not experience pain and suffering appears to be refuted by scientific fact, despite the reluctance of the abortionists, or pro choice, as they euphemistically style themselves, to admit this.*

---

* In 1984, some 26 health-care professionals wrote to then-President Reagan that, "the human unborn and newly born do respond to stimuli is also established beyond any reasonable doubt. The ability to feel pain and respond to it clearly is not a phenomenon that develops at birth."

## PRELIMINARY OBJECTIONS OF DEFENDANT HOLY SPIRIT HOSPITAL

In addition to the issues raised by the physicians and discussed above, the defendant hospital also asserts by way of demurrer its non-involvement in the patient's care, and hence the lack of any basis for liability.

To properly evaluate paragraph 22 of the complaint which delineates in rather general terms the alleged negligence of the hospital, it is necessary to consider paragraphs 15 through 19, which narrate the events leading up to Ms. Jovanelly's admission to the hospital. They describe her care by the doctors and her alleged attempts to secure treatment from them as her condition worsened. It is only at the very end where it is averred that she arranged to meet them at the hospital that this entity is mentioned.

Paragraph 19 alleges:

"(19) Upon meeting the defendant doctors at the defendant hospital, an ultrasound was performed and other tests were performed and mother was advised that the fetus was no longer alive. There had been movement and life prior to that time."

Plaintiff's complaint against the hospital appears to be based on a theory of corporate liability, as adopted in *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991). Indeed, the allegations set forth in subparagraphs 22(a)-(d) are merely a verbatim recital of the Supreme Court's classification of the duties incumbent upon a hospital:

"The hospital's duties have been classified into four general areas: (1) a duty to use reasonable care in the maintenance of safe and adequate equipment (ci-

tation omitted); (2) a duty to select and retain only competent physicians (citation omitted); (3) a duty to oversee all persons who practice medicine within its walls as to patient care (citation omitted); and (4) a duty to formulate, adopt and enforce adequate care for the patients." *Nason* at 339, 591 A.2d at 707. (citation omitted)

In this regard, the court has clearly stated that the duties owed under the corporate negligence doctrine run to patients at a hospital:

"Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed to the patient, which is to ensure the patient's safety and well-being while at the hospital." *Nason* at 339, 591 A.2d at 707.

Moreover, the four classifications of duties all relate to activities that take place within a hospital; the maintenance of safe and adequate facilities; selection and retention of competent physicians; supervising all persons who practice medicine within its walls; and adopting and enforcing adequate hospital rules and policies. *Id.*

Here, none of the allegations regarding pre-natal treatment and care and medical decisions communicated by telephone in any way involve care rendered to a hospital patient within the walls of the hospital. To hold the hospital on the theory of corporate negligence under the pleadings would extend the theory to encompass the hospital any time the plaintiff had any contact with it. We do not believe this was the intent of *Thompson v. Nason Hospital, supra,* nor is such a result desirable.

This conclusion renders any discussion of plaintiff's attempt to invoke the cloak of res ipsa loquitur with respect to the hospital or the defendants' allegations of lack of specificity in paragraph 22 unnecessary.

Accordingly, we enter the following

## ORDER

And now, April 23, 1992 paragraph 28 is stricken from plaintiff's complaint. The preliminary objections with respect to paragraphs 30 and 31 are denied.

Plaintiff's complaint against defendant Holy Spirit Hospital is dismissed for failure to state a claim upon which relief can be granted.

