Potere *v.* Philadelphia, Appellant.

Argued January 10, 1955.   Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*James Francis Ryan,* Assistant City Solicitor, with him *Israel K. Levy,* Assistant City Solicitor, *Jerome J. Shestack,* First Deputy City Solicitor and *Abraham L. Freedman,* City Solicitor, for City of Philadelphia, appellant.

*Ward C. Henry,* with him *Herbert A. Barton* and *Swartz, Campbell & Henry,* for Curly Construction Company, appellant.

*Joseph G. Feldman,* with him *Edward J. Marcantonio,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, March 14, 1955:
The plaintiff, Nicholas Potere, instituted this action in trespass against the City of Philadelphia to recover for personal injuries sustained by reason of the collapse of a street upon which he was driving. The original defendant joined Oxford Construction Company, Inc., with whom it had contracted for the construction of a storm water relief sewer, as an additional defendant. The additional defendant in turn brought upon the record as second additional defendant, Curly Construction Company, Inc., to whom it had subcontracted the tunneling work for the sewer. After trial of the issue, binding instructions were granted by the court for Oxford and the jury returned a verdict in favor of the plaintiff against the City and Curly in the sum of $5,000. Motions for new trial and judgment non obstante veredicto filed by both defendants were dismissed by the court en banc and judgment was en-

tered upon the verdict. These appeals by the City and Curly followed.

On September 22, 1951 at 12:10 P.M. the plaintiff, an employe of Cities Service Oil Company, was driving a cab-over-engine type gasoline tank truck, weighing approximately 9 tons, south on Frankford Avenue in the City of Philadelphia. Frankford Avenue, a well travelled thoroughfare running in a north-south direction, is 49 feet in width between curbs with a double set of street car tracks situated in the middle. After stopping for a red light at the intersection of Frankford Avenue and Clearfield Street, the plaintiff turned west into Clearfield Street and had nearly completed the turn when part of the road-bed of Clearfield Street suddenly gave way, causing the rear of plaintiff's truck to fall 19 feet into the cavity that resulted. The cab of the truck was suspended momentarily on a manhole at the level of the street, thereby affording the plaintiff an opportunity to extricate himself from the cab before the entire truck was engulfed in the subsidence.

Curly, as the subcontractor of Oxford, had been engaged in driving a tunnel under Clearfield Street, beginning at a point 200 feet east of Frankford Avenue and extending westwardly for a distance of 500 feet. The tunnel was 11 feet in diameter and ranged in depth from 28 to 34 feet below the street surface, varying according to the grade of Clearfield Street. Curly had undertaken the project sometime in April, 1951 and by September 22, 1951, the date of the occurrence, had progressed 35 feet west of the west curb line of Frankford Avenue, to a point almost directly under the site of the cave-in.

Roy Nichols, the supervisor for Curly, testified on behalf of the plaintiff that when he started on the job in July, 1951 the presence of water in the tunnel ne-

cessitated the installation of a vitrified pipe underneath the substructure of the tunnel to drain the water away from the workings toward a sump pump four feet below the base of the tunnel. When the tunneling approached Frankford Avenue, the ground became more saturated and a part of the tunnel east of Frankford Avenue appeared to be taking on weight. Upright timbers were installed to brace the steel liner plates which had buckled from the pressure of the overlying soil. This witness testified further that a few days prior to the cave-in an excessive amount of water began leaking through the joints of the liner plates on the roof of the tunnel and there was a depression in the street between the street car tracks on Frankford Avenue at about the middle of its intersection with Clearfield Street. After the City was notified and the City inspector examined the depression he called in the City Highway Superintendent who, together with a crew from that department, excavated the subsidence on September 20th. They dug a hole two or three feet deep and then probed about 18 inches farther with an air compressor gun but finding no evidence of a water leak, they backfilled the hole with cinders and dirt. The Water Department then made sounding tests on the water mains in the vicinity of the subsidence and found no evidence of leaks. When Curly's men discontinued work for the week-end on September 21st, the day preceding the cave-in, they pressed breast-boards supported by screw jacks against the earth at the forward end of the tunnel. This was the usual device employed by the contractor at the completion of each working day to prevent the unexcavated sand and gravel from falling into the tunnel.

An inspection of the area surrounding the cave-in subsequent to the accident disclosed two broken water mains, one a 6 inch main on Clearfield Street and the

other a connecting 10 inch main between the street car tracks on Frankford Avenue. The 10 inch main, located 4 or 5 feet below the street surface, was described by Nichols as "fractured clear through" with a separation of about one-half inch to an inch between the two parts, both sides of which were rusted. At the end of the tunnel a couple of the jacks which supported the breast-boards on each side had bent and slipped out of place, causing a large quantity of mud and water to be washed into the tunnel. Mr. Nichols stated that the rust on the 10 inch main could not have accumulated between the time of the cave-in and his inspection six hours later and in his opinion the cave-in was caused by water from the severed main seeping down into the ground until it undermined the breast-boards and washed into the tunnel.

The pivotal issue in the light of the joint verdict of the jury is whether the evidence was sufficient to warrant the finding that the defendants were concurrently negligent. Considering the testimony of the plaintiff in its most favorable light, as we must in this proceeding, it was established that the defendants had actual knowledge at least two days prior to the cave-in that a dangerous condition existed in the immediate vicinity of the partially completed tunnel. The City and the contractor had external manifestations or warnings of a possible defect under the street by the depression in the street surface, the excessive water in the tunnel and the additional weight on the roof of the tunnel.

At the trial the City defended on the ground that the tests used by it in detecting a possible water leak were recognized and approved methods and it sought to shift liability to the contractor by opinion evidence that the cavity resulted from the pressure of the saturated earth below the water table which permitted

earth to enter into the tunnel and thereby created a void. Curly attempted to show that it exercised reasonable care by evidence that it performed its work according to the customary and approved method of tunneling.

In determining whether the defendants discharged their duty in the premises, evidence of the customary methods or practices used by those engaged in the same or similar activities, while competent, was not necessarily conclusive. What constitutes reasonable diligence or care varies according to the circumstances and conditions presented and depends upon the facts of each particular case. In *Price v. New Castle Refractories Company*, 332 Pa. 507, 512, 3 A. 2d 418, this Court said: ". . . While custom or practice prevailing in a particular business in the use of methods, machinery and appliances is a most important factor in determining the question of negligence, ultimately it is for the jury to find whether under all the evidence—particularly where, as in the present case, it consists of oral testimony—the defendant was negligent: . . .". See also *Fox v. Keystone Telephone Company et al.*, 326 Pa. 420, 427, 192 A. 116. In the instant case there was evidence by a witness for plaintiff that the City should have excavated at least to the upper surface of the 10 inch main to discover whether the first subsidence was caused by a leaking water main, since the water would seek a downward level where, as here, the soil was composed of sand and gravel. There was also evidence that the side jacks supporting the barrier at the head of the tunnel were found in a bent condition after the cave-in, giving rise to the inference that the methods used by Curly in securing the tunnel were inadequate or insufficient under the circumstances. But in any event whether the measures applied by Curly were effectual or whether the City's efforts to locate

and stop the leak were negligently conducted, depending as they did on oral testimony, were pure questions of fact for the jury.

We are satisfied from the record that the jury could justifiably conclude that the municipality negligently permitted a certain condition to exist and that the contractor, after being apprised of an apparent danger by the weakened condition of the soil, relied solely on its ordinary and usual precautions, whereas common prudence dictated additional safeguards, and that the two acts of negligence played a substantial part in producing the injury that resulted. It is a matter of no moment that one act of negligence might have preceded the other slightly in point of time where two or more negligent acts are closely connected with the injury in the order of events and both concur in producing it: *Mars v. Meadville Telephone Company,* 344 Pa. 29, 23 A. 2d 856; *O'Malley v. Laurel Line Bus Co.,* 311 Pa. 251, 166 A. 868. And see *Vereb, Admr. v. Markowitz,* 379 Pa. 344, 351, 108 A. 2d 774.

The City alone has appealed from the lower court's refusal to award a new trial, urging in support of its motion that the verdict was excessive in view of the inconsequential physical injuries suffered by the plaintiff. The injuries averred and proved by the plaintiff as ensuing from the accident were a sprained ankle, bruised elbow, stiffness of the neck and back and severe shock to the nervous system, diagnosed as an anxiety neurosis. It is this latter element of damages, accounting for the greater part of plaintiff's out-of-pocket expenses, that the City contends is not compensable, primarily for the reason that the anxiety neurosis was largely attributable to a fall occurring over a year before. This contention is clearly without merit.

The testimony revealed that in June, 1950, plaintiff fell about 11 feet into a cellar when a trap-door in a telephone booth gave way. As a result of this accident plaintiff underwent an operation for a hernia and although nervous for a few months thereafter, this condition did not require treatment by a neurologist or a psychiatrist. After the accident in question, plaintiff's family physician referred him to Dr. Joseph C. Yaskin, a specialist in neuro-psychiatry, because of a severe agitative mental or emotional state. The uncontradicted testimony of Dr. Yaskin was that while the first accident "prepared" the plaintiff for the "devastating effects" of the second accident, the second fall ". . . was the determining cause of the anxiety state . . .". After a careful consideration of all of the testimony on the subject, we cannot say that there was insufficient proof of a neurosis attributable to the occurrence on September 22, 1951.

It has been well established that in the absence of physical injury or physical impact, mental or emotional distress is not the subject of legal redress: *Linn v. Duquesne Borough*, 204 Pa. 551, 54 A. 341; *Koplin v. Louis K. Liggett Company*, 322 Pa. 333, 185 A. 744. However, where, as here, a plaintiff sustains bodily injuries, even though trivial or minor in character, which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages: *Applebaum v. Philadelphia Rapid Transit Co.*, 244 Pa. 82, 90 A. 462; *Hess v. Philadelphia Transportation Company*, 358 Pa. 144, 56 A. 2d 89.

Judgment affirmed.

590

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

I concur in the decision of the Majority. However, I wish to state that it can happen that a person would suffer a severe traumatic emotional shock without physical injury or physical impact. To the extent that the Majority seems to infer that there could *never* be a situation where damages are recoverable in the absence of physical injury or physical impact, I disagree.