## Niederman, Appellant, v. Brodsky.

Argued May 2, 1969. Before Bell, C. J., Jones, Cohen, Eagen, O'Brien, Roberts and Pomeroy, JJ.

*Jerrold V. Moss,* for appellant.

*Harry W. Kurtzman,* with him *Carl K. Zucker,* for appellee.

Opinion by Mr. Justice Roberts, January 9, 1970:

Appellant, Harry Niederman, alleges that on November 4, 1962 he was walking with his son at the corner of 15th and Market Streets in Philadelphia. At that time, appellant's complaint asserts, appellee was driving a motor vehicle in a reckless and negligent manner as a result of which the automobile skidded onto the sidewalk and destroyed or struck down a fire hydrant, a litter pole and basket, a newsstand and appellant's son, who at that time was standing next to appellant. Almost immediately after this destructive path was cut by appellee's car, appellant claims that he suffered severe chest pain and that upon examination in the hospital, where he was confined for five

weeks, appellant was diagnosed to have sustained acute coronary insufficiency, coronary failure, angina pectoris, and possible myocardial infarction. Consequently, appellant sought recovery from appellee for both these severe disabilities and the accompanying shock and mental pain.

Appellant's complaint was reluctantly dismissed on preliminary objections for failing to state a cause of action under the "impact rule" which provides that there can be no recovery for the consequences of fright and shock negligently inflicted in the absence of contemporaneous impact. Appellant admitted that the careering automobile had never struck his person. The judge noted "The impact rule will, no doubt, eventually be rejected as was the formerly well-entrenched rule of charitable immunities. It is regrettable that Harry Niederman, the plaintiff in this action, may not be afforded the opportunity to prove that his injuries are just as real, just as painful, just as disabling as if he had been struck physically by defendant's motor vehicle. . . . However, we are bound by the law as set forth by the Supreme Court."

Today the cows come home.[1] We decide that on the record before us, appellant may go to trial and if he proves his allegations, recovery may be had from a negligent defendant, despite the fact that appellant's injuries arose in the absence of actual impact. "It is fundamental to our common law system that one may seek redress for every substantial wrong. 'The best statement of the rule is that a wrongdoer is responsible for the natural and proximate consequences of his misconduct . . . .'" *Battalla v. State,* 10 N.Y. 2d 237, 240, 219 N.Y.S. 2d 34, 36, 176 N.E. 2d 729, 730 (1961). By our holding today Pennsylvania proceeds along the path recently followed by our neighboring jurisdictions,[1] see

---

[1] Since 1929 *every other jurisdiction* which has considered the issue, has either abandoned the rule or refused to adopt it. See

*Falzone v. Busch,* 45 N.J. 559, 214 A. 2d 12 (1965); *Robb v. Pennsylvania Railroad Company,* 210 A. 2d 709 (Del. 1965); *Battalla v. State,* supra, and removes this ancient roadblock to appellant's recovery.

Were we to do otherwise, appellant and those who are severely injured in a like manner would be barred from recovery in our courts. But the gravity of appellant's injury and the inherent humanitarianism of our judicial process and its responsiveness to the current needs of justice dictate that appellant be afforded a *chance* to present his case to a jury and perhaps be compensated for the injury he has incurred. The Restatement has adopted a view in harmony with this approach: "§436 . . . (2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediately emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability." Restatement (Second), Torts §436(2).

We believe that it is not sufficient to perpetuate the old impact rule simply in the name of precedent. Each and every objection raised in the past which would preclude appellant in this case from going to trial can now be answered effectively and persuasively.

An analysis of the prior case law indicates that there have been three basic arguments which in the past would have defeated appellant. The first deals

Comment, Injuries from Fright Without Contact, 15 Cleve.-Mar. L. Rev. 331, 337 (1966).

A total of thirty-one jurisdictions have considered the impact rule. Of these 22, and perhaps 23 (depending on the resolution of the current confusion in Ohio) have rejected the requirement of impact. See Restatement, Torts (Second) §436, Reporter's Notes: *Robb v. Pennsylvania Railroad Company,* 210 A. 2d 709 (Del. 1965); *Falzone v. Busch,* 45 N.J. 559, 214 A. 2d 12 (1965); *Savard v. Cody Chevrolet, Inc.,* 234 A. 2d 656 (Vt. 1967).

with medical science's difficulty in proving causation between the claimed damages and the alleged fright. The second involves the fear of fraudulent or exaggerated claims. Finally, there is the concern that such a rule will precipitate a veritable flood of litigation. See, e.g., *Knaub v. Gotwalt*, 422 Pa. 267, 220 A. 2d 646 (1966) (not the view of a majority of the court) ; *Bosley v. Andrews*, 393 Pa. 161, 142 A. 2d 263 (1958) ; *Huston v. Freemansburg Borough*, 212 Pa. 548, 61 Atl. 1022 (1905) ; *Ewing v. Pittsburgh Railway Co.*, 147 Pa. 40, 23 Atl. 340 (1892).

The first objection has been variously stated but the quotation set out below is representative of some earlier judicial sentiments. "In most cases, it would be impossible for medical science to prove that these subjective symptoms could not possibly have resulted from or been aggravated or precipitated by fright or nervous tension or nervous shock or emotional disturbance or distress . . . . Medical science, we repeat, *could not prove* that these could not have been caused or precipitated, or aggravated by defendant's alleged negligent act." *Bosley v. Andrews*, 393 Pa. at 168-69, 142 A. 2d at 267. (Emphasis supplied.) While we agree that this might have been an appropriate conclusion because of the lack of sophistication in the medical field when the impact doctrine was first announced in 1888,[2] it would presently be inappropriate for us to ignore all of the phenomenal advances medical science has achieved in the last eighty years. Today diseases of

---

[2] The impact doctrine was first announced in England in *Victorian Railways Commissioners v. Coultas*, 13 App. & Cas. 222 (1888). Curiously enough the rule was abandoned only thirteen years later in *Dulieu v. White & Sons*, 2 K.B. 669 (1901) ; this was not sufficiently soon to block the spawning of the doctrine in this country. See, e.g., *Ewing v. Pittsburgh Railway Co.*, 147 Pa. 40, 23 Atl. 340 (1892) ; *Mitchell v. Rochester Ry. Co.*, 151 N.Y. 107, 45 N.E. 354 (1896).

the heart, for example, are comprehended much more fully (to the extent that open heart surgery is almost an everyday occurrence), and the effects of hyperemotional states of the human body no longer are shrouded in mystery or myth.

New equipment and research, improved education and diagnostic techniques, and an increased professional understanding of disease in general require us now to give greater credit to medical evidence. Other jurisdictions have also recognized that this advancement in the medical arts should and could be legitimately reflected in changes in the legal field. See, e.g., *Battalla v. State*, 10 N.Y. 2d 237, 219 N.Y.S. 2d 34, 176 N.E. 2d 729 (1961) ("we must...rely to an extent on the contemporary sophistication of the medical profession") ; *Robb v. Pennsylvania Railroad Company*, 210 A. 2d 709, 712 (Del. 1965) ("the early difficulty in tracing a resulting injury back through fright or nervous shock has been minimized by the advance of medical science"). Finally, The American Law Institute through a deletion of a caveat from one of its comments,[3] has expressed a similar view.

The logical invalidity of this objection to medical proof can be demonstrated further by noting that the rule has *only* been applied where there is absolutely no impact whatsoever. Once there is even the slightest

---

[3] In the year 1931, The American Law Institute in its commentaries to the first Restatement of Torts acknowledged that scientific and medical testimony might not be completely foolproof in this area. "The Institute expresses no opinion that the unreliability of the testimony necessary to establish the causal relation between the actor's negligence and the other's illness or bodily harm may not make it proper for the Court of a particular jurisdiction to refuse, as a matter of administrative policy, to hold the actor liable for harm to another which was brought about in the manner stated in this Subsection." But this caveat was *deleted* in 1948; we believe this is strong support for the belief that the medical profession now has the competency to establish causal relation.

impact, it has been held that the plaintiff can recover for any damages which resulted from the accompanying fright, even though the impact *had no causal connection* with the fright-induced injuries. The rule has been stated: "However, where, as here, a plaintiff sustains bodily injuries, *even though trivial* or minor in character, which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages." *Potere v. Philadelphia,* 380 Pa. 581, 589, 112 A. 2d 100, 104 (1955).

It appears completely inconsistent to argue that the medical profession is absolutely unable to establish a causal connection in the case where there is no impact at all, but that the slightest impact (e.g., a bruised elbow and sprained ankle in *Potere*)[4] suddenly bestows upon our medical colleagues the knowledge and facility to diagnose the causal connection between emotional states and physical injuries. It can easily be urged that recent advances in medical science have bestowed this ability upon physicians; but it is illogical to argue that the presence of some slight injury has accomplished the same effect! As the Supreme Court of our neighboring state of Delaware recently said: ". . . the line of cases permitting recovery for serious injuries resulting from fright, where there has been but a trivial impact in itself causing little or no injury, demonstrates that there is no insuperable difficulty in

---

[4] The most extreme case in which recovery was allowed for the damage caused by fear because there was some concurrent contact is *Jones v. Brooklyn Heights R.R. Co.,* 23 App. Div. 141, 48 N.Y.S. 914 (1897). There plaintiff was hit in the head by a small incandescent light bulb, which fell from the roof of the car in which plaintiff was riding. Because of this "impact" plaintiff was permitted to recover for the miscarriage which was brought on by the accompanying shock.

tracing causal connection between the wrongdoing and the injury via the fright." *Robb v. Pennsylvania Railroad Company*, 210 A. 2d at 712.

Finally, even if we assume *arguendo* that a great deal of difficulty still remains in establishing the causal connection, this still does not represent sufficient reason to deny appellant an *opportunity* to prove his case to a jury. There is no reason to believe that the causal connection involved here is any more difficult for lawyers to prove or for judges and jurors to comprehend than many others which occur elsewhere in the law. "We realize that there may be difficulties in determining the existence of a causal connection between fright and subsequent physical injury and in measuring the extent of such injury. However, the problem of tracing a causal connection from negligence to injury is not peculiar to cases without impact and occurs in all types of litigation . . . in any event, difficulty of proof should not bar the plaintiff from the opportunity of attempting to convince the trier of fact of the truth of her claim." *Falzone v. Busch*, 45 N.J. 559, 566, 214 A. 2d 12, 15-16 (1965). We recognize the recent view of the New Jersey Supreme Court as representative of current jurisprudence.

The second major objection includes the fear of fictitious injuries and fraudulent claims. It has been expressed with varying degrees of politeness: first, in *Huston v. Freemansburg Borough*, 212 Pa. 548, 550-51, 61 Atl. 1022, 1023 (1905), the Court indicated its lack of respect for claims like this by observing: "In the last half century, the ingenuity of counsel, stimulated by the cupidity of clients and encouraged by the prejudices of juries, has expanded the action for negligence. . . . It requires but a brief judicial experience to be convinced of the large proportion of exaggeration and even of actual fraud in the ordinary action for physical injuries from negligence, and if we opened the door

to this new invention the result would be great danger, if not disaster to the cause of justice." In recent cases, that concern has been expressed in a more charitable manner but the *same* denial of recovery for severe injuries has been the result. "For every wholly genuine and deserving claim, there would likely be a tremendous number of illusory or imaginative or 'faked' ones." *Bosley v. Andrews,* 393 Pa. at 169, 142 A. 2d at 267.

The charge that fraudulent claims will arise is not unique to this Commonwealth. Every court that has been confronted with a challenge to its impact rule has been threatened with the ominous spectre that an avalanche of unwarranted, trumped-up, false and otherwise unmeritorious claims would suddenly cascade upon the courts of the jurisdiction. The virtually unanimous response has been that (1) the danger of illusory claims in this area is no greater than in cases where impact occurs and that (2) our courts have proven that any protection against such fraudulent claims is contained within the system itself—in the integrity of our judicial process, the knowledge of expert witnesses, the concern of juries and the safeguards of our evidentiary standards.

For the first proposition, the New Hampshire Supreme Court provides us with significant support. "From the viewpoint of analogy, allowance for mental pain, and for injury to mind and nerve as well as body, is given as items of damage in all cases of liability for personal injury where there is impact. It would seem practically as easy to pretend them and as difficult to disprove them in such cases as in cases where there is no impact and fright is the intervening agency of transmittal." *Chiuchiolo v. New England Wholesale Tailors,* 150 Atl. 540, 543 (N.H. 1930). See *Savard v. Cody Chevrolet, Inc.,* 234 A. 2d 656, 659 (Vt. 1967) (quoting *Chiuchiolo*). In addition, it is abundantly clear that in the *Potere* case, supra, where the injury was slight

and unrelated, the opportunity for fraud was just as great; yet in that situation recovery was allowed. See *Battalla v. State*, 10 N.Y. 2d 237, 241, 219 N.Y.S. 2d 34, 37, 176 N.E. 2d 729, 731 (1961) ("fraudulent accidents and injuries are just as easily feigned in the slight-impact cases").

Furthermore, we are unable to accept the proposition that our courts and the judicial system in general cannot deal with fraudulent claims when they arise. Factual, legal, and medical charlatans are unlikely to emerge from a trial unmasked. This same thought has been given compelling exposition in recent opinions by the highest courts of our neighboring states, Delaware,[5] New Jersey,[6] and New York.[7] We, of course, join these and other authorities[8] in rejecting as patently falla-

---

[5] "As to the danger of illusory and fictional claims, this is not a new problem; our courts deal constantly with claims for pain and suffering based upon subjective symptoms only; and the courts and the medical profession have been found equal to the danger ... [T]he problems of adequacy of proof, for the avoidance of speculative and conjectural damages, are common to personal injury cases generally and are surmountable, being satisfactorily solved by our courts in case after case." *Robb v. Pennsylvania Railroad Company*, 210 A. 2d at 714 (Del. 1965).

[6] "As to the possibility of actions based on fictitious injuries, a court should not deny recovery for a type of wrong which may result in serious harm because some people may institute fraudulent actions. Our trial courts retain sufficient control, through the rules of evidence and the requirements as to the sufficiency of evidence, to safeguard against the danger that juries will find facts without legally adequate proof." *Falzone v. Busch*, 214 A. 2d at 16 (N.J. 1965).

[7] "Although fraud, extra litigation and a measure of speculation are, of course, possibilities, it is no reason for a court to eschew a measure of its jurisdiction. 'The argument from mere expediency cannot commend itself to a Court of justice, resulting in the denial of a logical legal right and remedy in all cases because in *some* a fictitious injury may be urged as a real one.' " *Battalla v. State*, 176 N.E. 2d at 731 (N.Y. 1961).

[8] See, e.g., Lambert, Tort Liability for Psychic Injuries, 41 Boston U. L. Rev. 584, 590-91: "This argument betrays a hopeless be-

cious the argument that would bar actions such as appellant's because some other litigants might present false or feigned claims. "Public policy requires the courts, with the aid of the legal and medical professions, to find ways and means to solve satisfactorily the problems thus presented—not expedient ways to avoid them." *Robb v. Pennsylvania Railroad Company,* 210 A. 2d at 714.

The last argument urged by the proponents of the impact rule is that: "If we permitted recovery in a case such as this, our Courts would be swamped by a virtual avalanche of cases for damages for many situations and cases hitherto unrecoverable in Pennsylvania." *Knaub v. Gotwalt,* 422 Pa. at 271, 220 A. 2d at 647. However, it is our view that this argument is currently refuted on two grounds. First, it is not at all clear that the flood of litigation has occurred in states without the impact rule. "The truth of the matter is that the feared flood tide of litigation has simply not appeared in states following the majority rule allowing recovery of psychic injuries without impact. The volume of litigation has been heaviest in states following the *Mitchell* doctrine and its impact rule. See McNiece, *Psychic Injury and Tort Liability in New York,* 24 St. John's L. Rev. 132 (1949) . . . ." Lambert, Tort Liability for Psychic Injuries, 41 Boston U. L. Rev. at 592. Even those who do not believe that the amount of litigation is *greater* in jurisdictions with the impact rule, maintain that there has been *no in-*

lief in the insolvency of the judicial process and its inability to separate genuine from bogus fright cases. The problem is one of the sufficiency of proof, and it is not necessary to bar redress in all cases because some claims may be groundless. . . . In truth the paralyzing fear that to allow recovery in 'psychic link' cases will make of our courts a dumping ground for false claims, because of the difficulty of proof and the danger of baseless claims, shows a cynical lack of faith in the ability of our courts and juries to sift the false from the true."

*crease* in those states which have abandoned this doctrine. *Okrina v. Midwestern Corp.*, 165 N.W. 2d 259, 263 (Minn. 1969) ("there is no indication that it [the abandonment of the impact rule] has either spawned a flood of litigation or bred a rash of fraudulent claims since its adoption in 1892"); see Smith, Relation of Emotions to Injury and Disease, 30 Va. L. Rev. 193 (1944); Comment, Injuries From Fright Without Contact, 15 Cleve.-Mar. L. Rev. at 336 (1966).

Secondly, and more compelling than an academic debate over the apparent or real increases in the amount of litigation, is the fundamental concept of our judicial system that any such increase should not be determinative or relevant to the availability of a judicial forum for the adjudication of impartial individual rights. "It is the business of the law to remedy wrongs that deserve it, even at the expense of a 'flood of litigation'; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do." Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich. L. Rev. 874 (1939). We obviously do not accept the "too much work to do" rationale. We place the responsibility exactly where it should be: not in denying relief to those who have been injured, *but* on the judicial machinery of the Commonwealth to fulfill its obligation to make itself available to litigants. Who is to say which class of aggrieved plaintiffs should be denied access to our courts because of speculation that the workload will be a burden? Certainly this Court is unwilling to allow such considerations to influence a determination whether a class of litigants will be denied or permitted to seek adjudication of its claims. See *Robb v. Pennsylvania Railroad Company*, 210 A. 2d at 714 (Del. 1965) ("if there be increased litigation, the courts must willingly cope with the task"); *Falzone v. Busch*, 214 A. 2d at 16 (N.J. 1965) ("the proper remedy is an

expansion of the judicial machinery, not a decrease in the availability of justice"); *Battalla v. State,* 176 N.E. 2d at 731 (N.Y. 1961) ("it is the duty of the courts to willingly accept the opportunity to settle these disputes").

. . .

We have carefully examined the arguments in support of the old impact rule. It seems clear to us that even if these rationales may have had validity in earlier years, in 1969 continued adherence to the rule makes little sense. We believe that our analysis of the underpinnings of the impact doctrine proves that they are now so weak and that the arguments opposing the doctrine are so strong that an overruling of earlier cases is compelled.

We today choose to abandon the requirement of a physical impact as a precondition to recovery for damages proximately caused by the tort in only those cases like the one before us where the plaintiff was in personal danger of physical impact because of the direction of a negligent force against him and where plaintiff actually did fear the physical impact. Since appellant's complaint alleges facts which if proven will establish that the negligent force was aimed at him and put him in personal danger of physical impact, and that he actually did fear the force, this case must proceed to trial.

The order of the Court of Common Pleas of Philadelphia County is reversed and appellee's preliminary objections are dismissed.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

The Majority too often forget that an emotionally appealing or heart-rending claim often produces bad law* and sets a dangerous precedent.

---

* The old axiom was thus expressed: "Hard cases make bad law."

## Pandora's Box

The majority Opinion commits three tremendous and grievous errors in overruling Pennsylvania's "impact rule." The first regrettable and disastrous error is that they open Pandora's famous Box, out of which will flow a multiplicity of trespass suits for personal injuries and/or diseases. These will include the most fictitious or false or exaggerated claims that the imagination can conceive—based upon (as the Majority assert) the *direction* of a negligent force so near a plaintiff that he feared a dangerous physical impact.

## A Guessing Game

The second major error of the Majority is that they not only substitute a "medical guessing game" for Pennsylvania's clear and definite and well-established "impact rule," but add a "Judicial guessing game." Few writers* and few States can agree on a clear and definite formula for recovery, and the Majority itself cannot formulate a clear, specific, definite and boundarized rule or standard for recovery in this so-called "impact" field, which the Majority now abolish. It is difficult to imagine stronger reasons for not abandoning Pennsylvania's clear and well-established impact rule than the jumble of diverse, indefinite and far-fetched views set forth in the majority Opinion.

---

\* Many writers today, including law school students and professors, believe that the way to rise to prominence and fame is through publicly denouncing decisions in any field of the Law and advocating the substitution of new and different standards in the name of "modernity." Neither such advocates nor the decisions or reasonings found in the Opinions of other State Courts are sufficiently persuasive to cause us to abandon Pennsylvania's "impact rule."

## Stare Decisis

The third major error of the Majority is that they deal another fatal or near-fatal blow to stare decisis. Once again a majority of the present Supreme Court has cavalierly buried or ignored the basic principle and the fundamental precept upon which the House of Law was built and maintained. Upon this Rock of Gibraltar, all Judges and all public officials, as well as all the people of Pennsylvania, can see and know and rely on their respective rights, their powers, their duties, their obligations and limitations. It is regrettable to be compelled to say that a decision of the present Court of Pennsylvania is good "for this day and this train only." What a catastrophe, and what a mockery of Law and of Justice!

What this Court said was well-established and sound law as recently as 1966 has today been rendered by the Majority obsolete and worthless by "all of the phenomenal advances medical science has achieved in the last 80 years." Can anything be more ridiculous than the argument that because of the phenomenal advances of medical science in the last 80 years something has miraculously come to light in this particular medical field in the last three years?

In *Knaub v. Gotwalt*, 422 Pa. 267, 220 A. 2d 646 (1966), we said (page 270): " 'The rule is long and well established in Pennsylvania that there can be no recovery of damages for injuries resulting from fright or nervous shock or mental or emotional disturbances or distress, unless they are accompanied by physical injury or physical impact: Koplin v. Louis K. Liggett Co., 322 Pa. 333, 185 A. 744; Ewing v. Pittsburgh C. & St. L. Ry. Co., 147 Pa. 40, 23 A. 340; Fox v. Borkey, 126 Pa. 164; Huston v. Freemansburg Borough, 212 Pa. 548, 61 A. 1022; Morris v. Lackawanna and Wyoming Valley Railroad Co., 228 Pa. 198, 77 A. 445;

Howarth v. Adams Express Company, 269 Pa. 280, 112 Atl. 536; Hess v. Philadelphia Transportation Co., 358 Pa. 144, 56 A. 2d 89; Potere v. Philadelphia, 380 Pa. 581, 112 A. 2d 100; Gefter v. Rosenthal, 384 Pa. 123, 119 A. 2d 250.' Bosley v. Andrews, 393 Pa. 161, 164, 142 A. 2d 263.* This rule was reaffirmed as recently as Cucinotti v. Ortmann, 399 Pa. 26, 159 A. 2d 216 [1960]."

In *Cucinotti v. Ortmann*, 399 Pa., supra, Justice Cohen, speaking for all the members of this Court except Justice Musmanno, said (page 29) : "It is the well-settled rule in Pennsylvania that there can be no recovery of damages for unintentional injuries resulting from fright or nervous shock or mental or emotional disturbances or distress, unless they are accompanied by physical injury or physical impact: Bosley v. Andrews, 393 Pa. 161, 142 A. 2d 263 (1958) ; Koplin v. Louis K. Liggett Co., 322 Pa. 333, 185 Atl. 744 (1936) ; Ewing v. Pittsburgh C. & St. L. Ry. Co., 147 Pa. 40, 23 Atl. 340 (1892)."

Mr. Justice Oliver Wendell Holmes repeatedly and eloquently emphasized that "the life of the law has not been logic; it has been [human] experience." Holmes, The Common Law. In *Homans v. Boston El. Ry. Co.,* 180 Mass. 456, 62 N.E. 737, that Court, speaking through Justice Holmes, reaffirmed the so-called "impact rule," and aptly said "that [it] prevents a recovery for visible illness resulting from nervous shock alone."

In *Huston v. Freemansburg Borough,* 212 Pa. 548, 61 Atl. 1022, Chief Justice Mitchell, speaking for a unanimous Court, stated there can be no recovery of damages for fright or other mental suffering unconnected with physical injury, and said: *"It requires but*

---

* All the members of the Supreme Court joined in this Opinion, except Mr. Justice Musmanno and Mr. Justice Cohen.

*a brief judicial experience to be convinced of the large proportion of exaggeration and even of actual fraud in the ordinary action for physical injuries from negligence, and if we opened the door to this new invention the result would be great danger, if not disaster to the cause of practical justice:** Spade v. Lynn & Boston R. R. Co., 168 Mass. 285; Mitchell v. Rochester Ry. Co., 151 N.Y. 107. If, therefore, the question were new, we should see no reason to reach a different conclusion. But it is settled for this State, and is no longer open to discussion. . . ."

This Court has iterated and reiterated this well-established rule or principle of Stare Decisis based on Judicial experience numerous times before and since *Huston,* 212 Pa. (1905),** supra.

In *Burtt Will,* 353 Pa. 217, 44 A. 2d 670, the Court said (pages 231, 232): "The doctrine of *stare decisis* still prevails in Pennsylvania. . . . This Court has always rigidly adhered to the rule of *stare decisis.* . . . All of the cases reciting our policy to adhere strictly to the rule of *stare decisis* need not be collected and reviewed. What was said by us in a few of the latest cases will suffice: Mr. Chief Justice MAXEY said in Monongahela St. Ry. v. Phila. Co. et al., 350 Pa. 603, 616, 39 A. 2d 909, 'The doctrine of stare decisis is recognized and applied by the courts of this Commonwealth . . .'; and in Davis v. Pennsylvania Co., etc., 337 Pa. 456, at 464, 12 A. 2d 66: 'An interpretation of law consistently followed by an appellate court over so long a period that it has become fundamentally imbedded

---

* Italics throughout, ours, unless otherwise noted.

** Indeed, I believe that Stare Decisis has been supported and approved by virtually every Chief Justice of Pennsylvania, including particularly Chief Justice BLACK, Chief Justice LOWRIE, Chief Justice MITCHELL, Chief Justice VON MOSCHZISKER, Chief Justice KEPHART, Chief Justice SCHAFFER, Chief Justice MAXEY, Chief Justice DREW, Chief Justice STERN, Chief Justice JONES, and the present writer.

in the common law of the Commonwealth should not be changed except through legislative enactment, which is a remedy always available and the proper one under our scheme of government. Otherwise the law would become the mere football of the successively changing personnel of the court, and "the knowne certaintie of the law", which Lord Coke so wisely said "is the safetie of all", would be utterly destroyed.' " (Italics in *Burtt Will* Opinion.)

In *Bosley v. Andrews,* 393 Pa. 161, 142 A. 2d 263, this Court (in a decision with only two dissents) said (pages 168-169) : "To allow recovery for fright, fear, nervous shock, humiliation, mental or emotional distress—with all the disturbances and illnesses which accompany or result therefrom—where there has been no physical injury or impact, would open a Pandora's box. . . . For every wholly genuine and deserving claim, there would likely be a tremendous number of illusory or imaginative or 'faked' ones."

By permitting recovery in cases such as this—for alleged mental, emotional, psychic or physical injuries, without physical impact, the Majority will, we repeat, open wide the doors to an avalanche of fraudulent or emotional or imaginary illness claims which will unfairly delay thousands of meritorious claims, and will swamp our already tremendously overburdened Courts and make a joke out of Justice.

One enormously important problem which the Majority blithely ignore is that while medical science has made tremendous progress in this century, it has not yet reached a stage of knowledge where it can prove with any certainty—or without a tremendous diversity of sincere opinion which would therefore amount to nothing but a guess—both medical and legal causation, especially in the emotional disturbance and heart disease fields.

I will give a few of the very many examples that will occur to everyone: A plaintiff might be driving

her car alertly or with her mind preoccupied, when a sudden or unexpected or exceptionally loud noise of an automobile horn behind or parallel with her car, or a nearby sudden loud and unexpected fire engine bell or siren, or a nearby sudden unexpected frightening buzz-saw noise, or a nearby unexpected explosion from blasting or dynamiting, or a nearby unexpected nerve-wracking noise produced by riveting on a street, or the shrill and unexpected blast of a train at a spot at a nearby crossing, or the witnessing of a nearby horrifying accident, or the approach of a car near or over the middle line, even though it is driven to its own side in ample time to avoid an accident, or any one of a dozen other everyday nearby events—each of these can cause or aggravate fright or nervous shock or emotional distress or nervous tension or mental disturbance and physical ills. If any one of these and other events are compensable, without physical impact, it may cause normal people, as well as nervous persons and persons who are mentally disturbed or mentally ill, to honestly believe that the sudden and unexpected event nearby and believed by them to be threatening, caused them fright or nervous shock or nervous tension with subsequent emotional distress or suffering or pain or heart attack or miscarriage, or some kind of disease or physical injury. In most cases, it would be impossible for medical science to prove that these subjective symptoms could or could not possibly have resulted from or been aggravated or precipitated by fright or nervous shock or nervous tension or emotional disturbance or distress, each of which can in turn produce an ulcer or headaches or fainting spells or, under some circumstances, a heart attack, or a serious disease or other injurious results. Medical science, I repeat, could not prove but *could only guess* whether these could or could not have been caused or precipitated or aggravated by defendant's alleged negligent act.

Here the plaintiff alleges that he suffered a variety of heart attacks immediately after defendant's car *skidded* onto the sidewalk and struck down a fire hydrant, a litter pole and basket, a newsstand, and injured plaintiff's son who was standing next to the plaintiff when the accident occurred. While the chain of events may have contributed to or caused Mr. Niederman's heart attacks, there are innumerable other possible situations which could have contributed to plaintiff's alleged heart attacks but in which no legal causation could be established.* Equally important, it is a matter of universal medical knowledge that numerous people walk the streets and countrysides engaged in their normal daily pursuits who have had heart disease for months or for several years without its having manifested itself.

Should we say to Stare Decisis, Quo Vadis? Or is Stare Decisis like Antaeus, who was lifted from but returned to the earth, or like Mohammed's coffin, which is suspended between Heaven and earth, with no one knowing when or which way it will rise or fall? Or is it like Nineveh and Tyre, which were destroyed, but every now and then are restored to temporary glory?

---

* For instance, a heart attack could be caused by witnessing an act of violence, being awakened by a sudden loud nearby noise, getting stuck in an elevator, fright or any emotional upset, tension, pressure, worry, anger, an unexpected fall, running for a train, excitement at a professional sports event, a loud explosion, thunder and lightning, a death in the family, a bitter family quarrel, fire, theft or loss of a valuable possession, stock market crash, sharp, loud, unexpected sounds of whistles, sirens, bells, screams, shouts, heavy construction, explosions of mines, bottles, balloons, firecrackers, winning or losing a large bet at the Kentucky Derby (or any sweepstakes or races), fear of loss of job or earnings, an unexpected and unfavorable medical diagnosis, a telegram containing bad news, having one's pocket picked or purse snatched, getting a "busy signal" when trying to place an important phone call for help, or any number of other everyday occurrences which would cause sudden fright or emotional upset or anger.

Today, no one knows from week to week or from Court session to Court session what the law is today or yesterday (retroactive decisions) or what it will be tomorrow. How can anyone know today what the law will be tomorrow, or what anyone's rights, privileges, powers, duties, responsibilities, limitations and liabilities are, or will be?

The basic principle of Stare Decisis which is the bedrock for all our Law is not as immutable as the law of the Medes and the Persians. It may be changed by the Legislature and, under some circumstances, it may be changed by the Courts. I would hold that the principle of Stare Decisis should always be applied, *irrespective of the changing personnel of this (or any Supreme) Court,* except (1) where the Supreme Court of Pennsylvania is convinced that prior decisions of the Court are irreconcilable; or (2) the application of a rule or principle has *undoubtedly* created great confusion; or (3) a rule of law has been only fluctuatingly applied; or (4) to correct a misconception in an occasional decision; or (5) in those rare cases where the Supreme Court is *convinced that the reason for the law undoubtedly no longer exists, and modern circumstances and Justice combine to require or justify a change, and no one's present personal rights or vested property interests will be injured by the change.* Change of circumstances or modern circumstances does not mean, nor has it ever heretofore been considered as the equivalent of change of personnel in the Court, or the substitution of the social or political philosophy of a Judge for the language of the Constitution or of a written instrument, or for well-settled principles of law.

Mr. Justice OWEN J. ROBERTS, Pennsylvania's most illustrious member of the Supreme Court of the United States, in a dissenting Opinion in *Smith v. Allwright,* 321 U.S. 649, 669, thus aptly and strikingly expressed his views concerning the erosion or abolition of the

principle of Stare Decisis: "The reason for my concern is that the instant decision, overruling that announced *about nine years ago,* tends to bring adjudications of this tribunal into the same class as a *restricted railroad ticket, good for this day and train only.* I have no assurance, in view of current decisions, that the opinion announced today may not shortly be repudiated and overruled by justices who deem they have new light on the subject."

Mr. Justice FRANKFURTER, in his concurring Opinion in *Green v. United States,* 356 U.S. 165, 192, said: "To say that everybody on the Court has been wrong for 150 years and that that which has been deemed part of the bone and sinew of the law should now be extirpated is quite another thing. . . . The admonition of Mr. Justice BRANDEIS that we are not a third branch of the Legislature should never be disregarded."

Mr. Justice DOUGLAS, who is generally regarded as the leading opponent of Stare Decisis, in an article written for the Columbia Law Review of June 1949, Vol. 49, p. 735, said: "Uniformity and continuity in law are necessary to many activities. If they are not present, the integrity of contracts, wills, conveyances and securities is impaired. And there will be no equal justice under law if a negligence rule is applied in the morning but not in the afternoon. Stare Decisis provides some moorings so that men may trade and arrange their affairs with confidence. Stare Decisis serves to take the capricious element out of law and to give stability to a society. It is a strong tie which the future has to the past."

Mr. Justice EAGEN well expressed the same concern for Stare Decisis in the recent case of *Commonwealth v. Woodhouse,* 401 Pa. 242, 253, 164 A. 2d 98 (1960): "Unquestionably, in a republican form of government as we are privileged to enjoy, order, certainty and stability in the law are essential for the safety and pro-

tection of all. Stare Decisis should not be trifled with. *If the law knows no fixed principles, chaos and confusion will certainly follow.* . . . If it is clear that the reason for a law no longer exists and modern circumstances and justice require a change, and no vested rights will be violated, a change should be made."

What Chief Justice BLACK said for this Court in *McDowell v. Oyer*, 21 Pa. 417, 423 (1853), concerning Stare Decisis, is presently most apposite, viz., "It is sometimes said that this adherence to precedent is slavish; that it fetters the mind of the judge, and compels him to decide without reference to principle. But let it be remembered that *stare decisis** is itself a principle of great magnitude and importance. *It is absolutely necessary to the formation and permanence of any system of jurisprudence.* Without it we may fairly be said to have no law; for law is a fixed and *established rule,** not depending in the slightest degree on the caprice of those who may happen to administer it."

Moreover, I may add that which is often forgotten by the Majority—it is one of the most important duties of an appellate Court to erect legal signposts with language inscribed thereon so clearly, definitely, wisely and well that they who read may easily understand. This the Majority have likewise failed to do, in this case.

For the above reasons, I very strongly dissent.

---

* Italics in *McDowell v. Oyer* Opinion.