Gerald L. PLUMMER et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Donald E. ALLEN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 76–114, 76–887.

United States District Court, M. D. Pennsylvania.

Oct. 19, 1976.
As Amended Jan. 4, 1977.

Lee Mandell, H. Robert Switzer, Philadelphia, Pa., for plaintiffs.

Joseph F. Cimini, Lewisburg, Pa., for defendant.

## OPINION

MUIR, District Judge.

During the first five months of 1974, all of the Plaintiffs in the above-captioned two cases were inmates at the United States Penitentiary in Lewisburg, Pennsylvania. They contend that as a proximate result of the negligence of personnel at the prison, they were injured by exposure to another inmate suffering from an active case of tuberculosis. In accordance with the Court's standard procedure in all civil cases, the trial was bifurcated. Further, because it appeared that the most difficult element of proof confronting the Plaintiffs was the existence of injuries sustained by them, that question was, pursuant to the authority vested in the Court by F.R.Civ.P. 42(b), isolated and tried first. Since this is an action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., there is no right to a trial by jury and evidence with respect to the question of injury was heard by the Court from September 23, 1976 through September 30, 1976. The Court makes the following findings of fact:

## I. FINDINGS OF FACT

1. Tuberculosis is an infectious disease caused by the invasion of tubercle bacilli.

2. Its symptomology ordinarily consists of anorea (loss of appetite), loss of weight, fatigue, night sweats, chills, coughing, hemoptysis (expectoration of blood) and abnormal temperature.

3. A tuberculin skin test is a simple means of discovering if a tubercle bacillus has entered an individual's body. (Undisputed)

4. The PPD (Pure Protein Derivative) test, which measures skin reaction to its injection, is a medically accepted method for ascertaining the presence of tubercle bacilli.

5. Another medically acceptable, though less reliable, method which also measures skin reaction is the so-called tine test.

6. A positive tuberculin skin test indicates in a great majority of cases that the individual had exposure to tuberculosis in the past and that at some time at least one tubercle bacillus had entered his body.

7. A positive PPD or tine test indicates nothing more than the presence of a tubercle bacillus, which may be dormant.

8. Tuberculosis is proven by a chest X-ray plus bacteriological evidence by way of sputum culture or skin test.

9. Inactive tuberculosis is asymptomatic.

10. In rare cases, an individual can react positively to a PPD test or a tine test even though there is no tubercle bacillus present in his body.

11. Coughing, sneezing and singing commonly spread droplet nuclei containing the tubercle bacilli to an extent dependent upon the number of bacilli in the discharge, the size of the quarters and the ventilation conditions.

12. If an individual produces a positive skin test within a two-year period after having had a negative skin test, he is considered a "recent converter".

13. One suffering from an active case of tuberculosis can cause many persons to become "recent converters".

14. When a person is exposed to an individual who is discharging tuberculosis germs, that person may develop no symptoms, very minor symptoms or active tuberculosis.

15. Some individuals who have been infected have calcium nodules in their lungs which show up as "spots" in a chest X-ray.

16. Entry of a tubercle bacillus into an individual's body does not mean that the individual has become diseased.

17. An individual who reacts positively to a tuberculin skin test is not considered infectious unless he is discharging tubercle bacilli.

18. Most people who have a positive skin test for tuberculosis, so-called "positive reactors", never get active tuberculosis and do not become aware of having the tuberculosis germ until advised of the results of a skin test.

19. People who react positively to the tuberculin skin test will have a positive reaction upon future tests in almost all cases.

20. The great majority of people in this country never become infected with tuberculosis at any time in their lives.

21. Eight percent of the U.S. population who have been tested have had positive tuberculin skin tests.

22. The percentage of the United States population having positive tuberculin skin tests is decreasing.

23. In 1971, the most recent year for which data are available, there were 39,000 new cases of active tuberculosis of which 36,000 arose in people who had had a prior positive skin test.

24. Most positive reactors resist their initial exposure to the tuberculosis germ and do not develop active tuberculosis.

25. Although tuberculosis used to be treated by extended isolation, sometimes for years, it is now treated with safe, inexpensive drugs that can be taken orally.

26. Isolation because of tuberculosis is now rarely needed for more than two weeks.

27. An individual who is a "recent converter" will normally require medication for one year.

28. Medically accepted practice provides that recent converters follow a course of treatment for one year with the drug isoniazid (INH).

29. A person who has been infected develops an immunity to further exogenous infection, but not an immunity to endogenous reactivation.

30. If the recommended one-year INH treatment is followed, there is essentially no risk of the individual ever contracting active tuberculosis by exposure and a somewhat greater, although minimal, risk of spontaneous reactivation.

31. Reactivation can occur at any time during a person's lifetime, although the risk of such an occurrence diminishes substantially after two years from the date of exposure.

32. Persons treated with INH have an 80–90% better protection against active tu-

berculosis than persons who tested positively and thereafter received no such treatment.

33. The chances for a person who has been infected with tubercle bacilli to contract active pulmonary tuberculosis through reactivation are substantially the same as for a person who has not been so infected to contract the disease through exposure to an active case.

34. The difference in the chances is negligible and it is impossible to ascertain which risk is greater.

35. Alan H. Lieberman, M.D., at the time an officer of the United States Public Health Service, was the Chief of Health Programs at the United States Penitentiary, Lewisburg, Pennsylvania, between July 1, 1973 and June 30, 1974. (Undisputed)

36. Anthony J. Casella, M.D., at the time an officer in the United States Public Health Service, was a staff physician at the United States Penitentiary, Lewisburg, Pennsylvania, for one year, before becoming the Chief of Health Programs between July 1, 1974 and June 30, 1975. (Undisputed)

37. At all times relevant to the instant lawsuit, Samuel Bray was in the lawful custody of the Attorney General of the United States. (Undisputed)

38. Samuel Bray was quartered in Cell Block "A" and was assigned to work in the Penitentiary Clothing Factory from February 4, 1974 to May 16, 1974. (Undisputed)

39. On February 8, 1974, Samuel Bray was examined by a Lewisburg Penitentiary physician because of a cough. (Undisputed)

40. On May 13, 1974, two sputum specimens collected from Samuel Bray on February 13, 1974, were reported to contain the tuberculosis germ on culture. (Undisputed)

41. On May 16, 1974, Samuel Bray was hospitalized, isolated and treated for tuberculosis.

42. Lewisburg Penitentiary officials began an investigation of the contacts of Samuel Bray and, from on or about May 23 to on or about May 30, 1974, such contacts

in the vicinity of his living quarters, as well as his close friends, were skin-tested.

43. The parties Plaintiff in the instant case all either have been or are prisoners in the lawful custody of the Attorney General of the United States who have spent time at the United States Penitentiary, Lewisburg, Pennsylvania. (Undisputed)

44. Plaintiff Charles C. Ray was quartered in Cell Block "A" in a cell that was approximately three cells away from that of Samuel Bray's from the period March 15, 1974 to June, 1974. (Undisputed)

45. Ray had a positive reaction to a skin test for tuberculosis following suspected exposure to Samuel Bray. (Undisputed)

46. Ray's suspected exposure to tuberculosis was noted in his medical file at Lewisburg on May 30, 1974. (Undisputed)

47. Because it was believed that his reaction to previous tuberculosis skin-testing had been negative, Ray was considered to be a "recent converter". (Undisputed)

48. Ray's chest X-ray ordered in May of 1974, was read as negative for tuberculosis.

49. On or about June 11, 1974, Ray began treatment with the drug INH.

50. Lewisburg Penitentiary medical personnel initially advised Ray to continue the tuberculosis drug treatment for one year.

51. Ray was transferred to the United States Penitentiary, Marion, Illinois, in December, 1974.

52. Ray developed an allergic rash over his entire body from the medication INH which was prescribed for him.

53. Ray had the rash for two periods, one of 8 to 10 weeks duration, and the other of 4 weeks duration.

54. Plaintiff Alfred Jeffress was quartered in Cell Block "A" in a cell that was in close proximity to that of Samuel Bray's before, during and after the period of February 4, 1974 to May 16, 1974. (Undisputed)

55. Jeffress had a positive reaction to a skin test for tuberculosis following suspected exposure to Samuel Bray. (Undisputed)

56. Jeffress accepted the medication INH prescribed for him by Lewisburg Penitentiary Hospital physicians.

57. Plaintiff James B. Smoak was quartered in Cell Block "A" in a cell that was in close proximity to Samuel Bray's before, during and after the period of February 4, 1974 to May 16, 1974 and, in addition, came into contact with Samuel Bray while working with him in the Penitentiary's Clothing Factory. (Undisputed)

58. Smoak had a positive reaction to a skin test for tuberculosis following suspected exposure to Samuel Bray. (Undisputed)

59. Smoak accepted the medication INH prescribed for him by Lewisburg Penitentiary Hospital physicians.

60. Plaintiff Rosa Crespo was quartered in Cell Block "A" in a cell that was in close proximity to Samuel Bray's before, during and after the period of February 4, 1974 to May 16, 1974. (Undisputed)

61. Crespo had a positive reaction to a skin test for tuberculosis following suspected exposure to Samuel Bray. (Undisputed)

62. Because it was believed that his reaction to previous tuberculosis skin-testing had been negative, Rosa Crespo was considered to be a "recent converter". (Undisputed)

63. Crespo's chest X-ray in May, 1974 was read negative for tuberculosis.

64. Crespo accepted the medication INH prescribed for him by Lewisburg Penitentiary Hospital physicians.

65. There is social stigma among Puerto Ricans regarding tuberculosis and many will deny having had tuberculosis even though they know they have had it and have been successfully tested for it.

66. Plaintiff Kenneth A. Moulden was quartered in Cell Block "A" in the cell immediately adjacent to Samuel Bray's before, during and after the period of February 4, 1974, to May 16, 1974. (Undisputed)

67. Moulden had a positive reaction to a skin test for tuberculosis following suspected exposure to Samuel Bray. (Undisputed)

68. Although all details were explained to him, Moulden refused treatment as prescribed for him by Lewisburg Penitentiary Hospital physicians because he feared that he would contract hepatitis which is a potential side effect of INH.

69. Moulden had chest X-ray reports in May and July of 1974 which were read as negative for tuberculosis.

70. Plaintiff Kenneth A. Jenkins was placed in the same cell in Block "A" that Samuel Bray had previously lived in, having been assigned that cell the day after Mr. Bray had vacated it. (Undisputed)

71. Mr. Jenkins was immediately notified of Bray's condition and was fearful of being infected.

72. Jenkins had a positive reaction to a skin test for tuberculosis following suspected exposure to Samuel Bray. (Undisputed)

73. Jenkins previously had a positive tuberculin skin test.

74. Jenkins had a chest X-ray report in May, 1974, which was read as negative for tuberculosis.

75. Jenkins accepted the medication INH prescribed for him by Lewisburg Penitentiary Hospital physicians. (Undisputed)

76. Plaintiff Orlando Jennings was quartered in Cell Block "A" in a cell approximately seven cells away from Samuel Bray's before, during and after the period of February 4, 1974, to May 16, 1974. (Undisputed)

77. Jennings had a positive reaction to a skin test for tuberculosis following suspected exposure to Samuel Bray. (Undisputed)

78. Although all details were explained to him, Jennings refused treatment as prescribed for him by Lewisburg Penitentiary Hospital physicians because he feared that he would contract hepatitis which is a potential side effect of INH.

79. Jennings had chest X-ray reports in May, July, and December, 1974 which were read as negative for tuberculosis.

80. Plaintiff Donald E. Allen was quartered in Cell Block "A" in a cell that was two cells away from that of Samuel Bray's

for the period May 15, 1974 to May 17, 1974. (Undisputed)

81. Allen had a positive reaction to a skin test for tuberculosis following suspected exposure to Samuel Bray. (Undisputed)

82. Allen had a chest X-ray report in May, 1974 which was read as negative for tuberculosis.

83. Allen accepted the medication INH prescribed for him by Lewisburg Penitentiary Hospital physicians. (Undisputed)

84. Tests made from sputum specimens collected from Allen in June, 1974, were returned as negative for the smear and no growth on culture. (Undisputed)

85. No Plaintiff contends that he contracted active tuberculosis as a result of exposure to Samuel Bray.

86. Plaintiffs Allen, Jeffress, Jenkins, and Jennings are no longer incarcerated.

87. None of the Plaintiffs other than Ray had any pain or suffering.

88. Ray suffered minimally from his rash, but had no pain from the rash or the infection.

89. The permanency of condition of the Plaintiffs has not increased the risk that they will contract active tuberculosis sometime later in life.

90. The inconvenience to Plaintiffs of taking the medication INH was negligible.

91. There is no occupation from which the Plaintiffs must be precluded by reason of their tubercular infection.

## II. DISCUSSION

The Plaintiffs in this case invoke the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. Since there is no dispute that they have exhausted their administrative remedies pursuant to 28 U.S.C. § 2675 prior to the institution of their suits, the Court has jurisdiction. 28 U.S.C. § 1346(b).

On February 8, 1974, Samuel Bray, then an inmate at the United States Penitentiary in Lewisburg, Pennsylvania, was examined by a physician for a persistent cough. Bray was not given any special medical attention and continued to live and work in the inmate population as he had done prior to February, 1974. On February 13, 1974, two sputum specimens which had been collected from Bray were sent to a state laboratory for culturing to determine whether Bray was suffering from tuberculosis. On May 13, 1974, three months after the specimens were collected, the laboratory reported that they contained tuberculosis germs "on culture". On May 16, 1974, three days after receipt of the report, Samuel Bray was hospitalized, isolated, and treated for tuberculosis.

Investigation by Lewisburg officials into the possible contacts of Samuel Bray led to the skin testing, *inter alia*, of the Plaintiffs. Each reacted positively to the PPD (Pure Protein Derivative) test administered. The PPD test is a medically accepted method for ascertaining the presence in an individual's body of tubercle bacilli, the germs which cause tuberculosis. At the time of trial, none of the Plaintiffs had developed an active case of tuberculosis.

The Plaintiffs contend that the United States and its agents were negligent by:

(a) Hiring incompetent employees who incorrectly treated Bray and improperly collected and prepared the sputum cultures taken from him;

(b) Failing promptly to dispatch sputum specimens to the state laboratory for culturing;

(c) Failing to isolate Bray immediately despite his history of tuberculosis and despite the crowded living conditions at Lewisburg; and

(d) Failing to investigate the alleged extraordinary delay in reporting of the results of the sputum culturing being conducted by the state laboratory.

The Plaintiffs contend that as a proximate result of this negligence, they have been "infected" by one or more tubercle bacilli and are entitled to damages therefor.

■ Because the United States, in addition to disputing its negligence, contests whether the Plaintiffs have in fact been

harmed, that issue was isolated and tried first. See F.R.Civ.P. 42(b).

In non-medical vernacular the word "infection" carries a pejorative connotation which is not entirely deserved. For example, many common vaccinations are "infections" which elicit the body's defense mechanisms and lead to the creation of an immunity to a later, more virulent infection. Although no vaccine presently exists for tuberculosis, the body's reaction to the invasion of a tubercle bacillus is similar to that which occurs when a deliberate innoculation is performed.

Although entry of a tubercle bacillus or bacilli is, of course, a prerequisite to the contraction of the disease tuberculosis, the mere fact that a tubercle bacillus has penetrated one's system does not necessarily cause one to be physically impaired or dangerous to others. Many individuals who have been "infected" by tubercle bacilli never know it and never develop the slightest symptoms of the disease tuberculosis.

Recommended treatment for individuals, like the Plaintiffs, who are aware of their condition by reason of a positive skin test, is a one-year course on a drug called isoniazid (INH). Five of the Plaintiffs took the prescribed INH. Ray took the medication over a one-year period interrupted by interludes totalling approximately three months in which it was discontinued because he apparently had an allergic reaction to it. Plaintiffs Moulden and Jennings refused the treatment because of the potential danger of hepatitis which can be a side effect of INH.

"Recent converters"—individuals who react positively after having had a negative test within the previous two years—treated with INH for one year, have an 80–90% greater protection against the onset of active tuberculosis than recent converters who are not so treated. Furthermore, the risk of active tuberculosis for any recent converter diminishes substantially two years after his first "infection" with tubercle bacilli and remains so diminished for his lifetime.

Although a positive reactor lives with the possibility of suffering tuberculosis as the result of a spontaneous "reactivation" of the germs he carries, his "infection" virtually eliminates any risk of developing the disease by exposure to an active case. Consequently, an individual with a negative PPD test has a greater likelihood of contracting tuberculosis by exposure to an active case than do the Plaintiffs, even though the risk is quite small. Based on the evidence adduced at trial, the Court is of the view that the chances for a person who has been infected with tubercle bacilli to contract active pulmonary tuberculosis through reactivation are substantially the same as those for a person who has not been so infected to contract the disease through exposure to an active case. Because of the many factors which impinge on a particular individual's susceptibility to tuberculosis, it is nearly impossible to determine which risk is greater, if either is greater than the other. Therefore, it is more likely true than not true that the Plaintiffs are no worse off vis-a-vis tuberculosis than are "negative reactors".

In the light of the foregoing, the Court concludes that, even assuming *arguendo* that the Lewisburg staff was negligent in its treatment of Bray, the Plaintiffs, except as discussed below with respect to Charles Ray, have as a result suffered none of the injuries they attempted to prove. There are no occupations from which they *should* be precluded by reason of their condition. Although societal prejudices and misunderstandings may foreclose particular jobs to these Plaintiffs, the law of torts does not compensate for all injuries caused by breaches of legal duties. *Conway v. Spitz*, 407 F.Supp. 536, 538 (E.D.Pa.1975). There has been no demonstration of compensable mental suffering despite the recent relaxation in Pennsylvania of certain rules regarding recovery for mental anguish. See *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970). No Plaintiff has demonstrated that his concern about his condition resulted in a "severe and concrete physical manifestation" which is fairly well understood by medical science. *Conway v.*

*Spitz,* supra at 539. Nor have they alleged "intentional, outrageous or wanton conduct" which might entitle them to recover for their fears, no matter how unfounded. *Conway v. Spitz,* supra at 539. The mere fact that the Plaintiffs' condition is permanent does not entitle them to compensation because they are not injured by the condition. Finally, the inconvenience to those Plaintiffs who chose to take the medication INH was practically nil.

On two separate occasions, Plaintiff Charles Ray developed a skin rash over his entire body which was a direct side effect of the medication INH. At the conclusion of the injury phase of the case, the Court had tentatively reached its ultimate decision and it appeared that the only possibly compensable injury which would remain was Ray's skin rash. The Court was of the view that the possibility of obviating further trial on the issues of negligence and proximate cause could be facilitated by fixing Ray's damages for that injury. Consequently, the Court heard all evidence on the extent of the pain and suffering incurred by Ray from his rash.

In the event that Ray can demonstrate that his rash was a proximate result of negligence attributable to the Defendant, he will be awarded damages in the amount of $150.00.

### III. CONCLUSIONS OF LAW

1. All Plaintiffs exhausted their administrative remedies prior to instituting the above actions.

2. Pennsylvania law controls the issue of liability under the Federal Tort Claims Act in this case.

3. The Plaintiffs excepting Charles Ray have failed to show that exposure to Samuel Bray proximately caused them any injury.

4. The United States is not potentially liable to Charles Ray for any injury other than his skin rash.

5. In the event that at a later trial of the issues of negligence and proximate cause the United States is held liable to Charles Ray, his recovery will be limited to damages for his skin rash and will be in the amount of $150.00.

6. The United States is not liable to any of the other parties plaintiff because each has failed to demonstrate a compensable injury which is attributable to the alleged negligence of the Defendant.

7. Any mental anguish suffered by Plaintiffs was not related to any legally recognizable injury.

An appropriate order will be entered.